## AFFIDAVIT OF TASK FORCE OFFICER MATTHEW GUTWILL

I, Matthew J. Gutwill, a Task Force Officer with the Drug Enforcement Administration, being duly sworn, depose and state as follows:

## I. BACKGROUND OF AFFIANT

1.  I am a detective with the Framingham Police Department currently assigned to the U.S. Drug Enforcement Administration ("DEA") and the Organized Crime Drug Enforcement Task Force ("OCDETF") Boston Strike Force in Watertown, Massachusetts. I have been a Framingham police officer for approximately eight years, and a narcotics detective for the last five years. Prior to joining the Framingham Police Department, I was a police officer and narcotics detective for the Town of Ashland, Massachusetts. Since February 2008, I have been assigned as a federal DEA Task Force Officer ("TFO"). As a deputized TFO, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516. As a deputized TFO, I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.  My primary duties as a DEA TFO include the investigation of organized narcotic traffickers, narcotics-distribution and money-laundering offenses, and other federal and state crimes. I have received training in the field of narcotics enforcement and investigations including, but not limited to, the identification of common street drugs such as Oxycodone. During my tenure as a police officer, detective, and TFO, I have worked on over 100 drug investigations as a case agent and in a supporting role. I have

participated in approximately 15 to 20 investigations that involved the use of court-ordered interception of wire and/or electronic communications. Through my training, education, and experience, I have also become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with methods of payment for such drugs. I am familiar with various means of negotiations, communication, as well as the appearance, packing, texture, and smell of certain narcotics. I am also familiar with the vernacular, or code words and terms, which sellers and users of narcotics use. Further, I am familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation to protect their operations, members, narcotics, and narcotics proceeds, in furtherance of their narcotics trafficking activity.

3.    During the course of my law enforcement career, I have written and/or participated in the execution of numerous search warrants both as a Detective with the Framingham Police Department and as a Federal Task Force Officer with the DEA. In a substantial number of residential searches executed in connection with the drug investigations in which I have been involved, the following kinds of drug-related evidence have typically been recovered: (a) controlled substances, such as marijuana, oxycodone, cocaine, and heroin; (b) paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances; (c) books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances; (d) personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to individuals involved in the distribution of controlled substances; (e) cash, currency, and records relating to controlled substances income and expenditures of money

2

and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, and checkbooks; (f) specially manufactured hidden compartments known as "hides" that are used to store drugs and drug proceeds and which are at time electronically controlled and operated; and (g) firearms and other dangerous weapons.

4.     In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

5.     Based upon my training and experience, as well as the knowledge and experience of other agents and police officers in my office, I am aware that it is generally a common practice for drug traffickers to store their drug inventory and drug-related paraphernalia (as described above) in their residences. Further, it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also typically be maintained close at hand so as to readily ascertain current balances. Often drug traffickers keep "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally,

3

drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to conduct their drug trafficking business efficiently.

6.      It is also a generally common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

7.      Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

8.      My awareness of these drug trafficking practices, as well as my knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: (a) my own involvement in prior drug investigations and searches during my career as a law enforcement officer, as previously described in the training and qualifications portion of this affidavit; (b) my involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised me when relating the substance of their similar debriefings and the results of their own drug investigations, more particularly described below; (c) from this particular investigation and other investigations involving the

interception of wire communications pursuant to a court authorized Title III wiretap.

## II. INTRODUCTION

9.    I am submitting this affidavit for two reasons -

    a.    In support of a criminal complaint charging: (1) Michael BOURQUE, (2) Robert HAGENAARS, (3) Brian CHISHOLM, (4) Barry GOOLST, (5) Phillip GOOLST, (6) Thomas EHWA, (7) Frank MCGUIRE, (8) Michael ROY, (9) Christopher YANCEY, (10) Corey ASSENCOA, (11) Sean COTTER, (12) Mark NEWTON, (13) Mark OUELLETTE, (14) John KINNEY, and (15) Raymond PANAGGIO (collectively, the "Target Subjects"), with conspiracy to distribute Oxycodone, in violation of 21 U.S.C. §846; and

    b.    In support of search warrants for the following locations (collectively, "Target Locations"):

        i.    197 West Central, Natick, Massachusetts ("Target Location #1");

        ii.    325 Speen Street, Apartment 210, Natick, Massachusetts ("Target Location #2");

        iii.    30 Prairie Avenue, Newton, Massachusetts ("Target Location #3");

        iv.    95 Robbins Street, Apartment 1, Waltham, Massachusetts ("Target Location #4");

        v.    95 Robbins Street, Apartment 2, Waltham, Massachusetts ("Target Location #5"); and

        vi.    6 Lancaster Road, Shirley, Massachusetts ("Target Location #6").

10.    Each of the Target Locations are more fully described in Attachment A to each of the

search warrants, which includes a photograph of each Target Location.   The items to be searched for and seized at the Target Locations are more fully described in Attachment B to each of the search warrants.

11.   This affidavit does not set forth all the facts developed during the course of this investigation.  Rather, it sets forth only those facts that are necessary and sufficient to establish probable cause to believe that the defendants identified herein have committed and will continue to commit controlled substance and money laundering offenses and evidence, fruits, instrumentalities of these offense will be found in the above described target locations.

### III.  BACKGROUND OF INVESTIGATION

12.   The instant investigation targets the drug trafficking activities of MICHAEL BOURQUE ("BOURQUE") of Natick, Massachusetts.  The investigation has revealed that BOURQUE  is involved in a drug trafficking organization (DTO) responsible for the distribution of large quantities of illegal drugs containing Oxycodone.[1]  Oxycodone is a Schedule II controlled substance and is found in certain prescription pain relievers such as Percocet and OxyContin that are usually sold in pill form.  Specifically, BOURQUE is involved in the distribution of thousands of Percocet 30 mg pills, also known as "Perc 30's," small blue pills that each contain approximately 30 milligrams of Oxycodone.

**A.     Information from Cooperating Witness No. 1 ("CW-1")**

13.   The investigation began following the seizure of approximately 700 Percocet pills on

---

[1]  In addition to Oxycodone, BOURQUE is believed to be involved in the distribution of additional narcotics, including marijuana, cocaine, and morphine.

████████████2011, from an individual (CW-1) who, upon arrest, agreed to cooperate with the Natick and Framingham Police Departments.

14.     CW-1 told law enforcement that CW-1 was delivering 700 "Perc 30's" (Percocet pills containing 30 mg of Oxycodone) to a male named ████ at ████████████for a male CW-1 identified as MICHAEL BOURQUE who lived at 8 Grant Street, Unit-20, Natick, Massachusetts, a three-story townhouse.  At the time of the interview in February 2011, CW-1 said that CW-1 had been making drug deliveries for BOURQUE for the past six months, and was making about 20 to 30 deliveries of Percocets a day.  At the time of CW-1's arrest, CW-1 had been using Oxycodone on a daily basis since 2010.  CW-1 told investigators that CW-1 ████████████████████████████████████ ████████████

15.     CW-1 told investigators that earlier that day at about 5:00 p.m., BOURQUE had given CW-1 the 700 Percocet pills inside BOURQUE's residence to distribute to ██████ CW-1 stated that after CW-1 delivered the pills, CW-1 was going to return whatever money████ provided to CW-1 to BOURQUE.  CW-1 also told investigators that CW-1 had made about 10 to 15 Percocet deliveries for BOURQUE that day, and stated that CW-1 believed that BOURQUE was still in the possession of about 3,000 to 5,000 Percocet pills inside his residence at 8 Grant Street.  CW-1 further told agents that on one occasion, CW-1 had seen BOURQUE in possession of a handgun, a stainless steel revolver with white handles, and that BOURQUE had told CW-1 that if anyone entered his home, that person would get "five to the head."  During the interview, officers also showed CW-1 an RMV photograph of MICHAEL BOURQUE who CW-1 positively

identified as MICHAEL BOURQUE, the person for whom CW-1 had been making drug deliveries for about 6 months.

16.    After receiving this information from CW-1, investigators applied for and received authorization for a Framingham District Court search warrant at BOURQUE's townhouse residence at 8 Grant Street, #20, Natick, Massachusetts. Officers executed the search warrant at approximately 11:45 p.m. During the execution of the warrant, officers found three individuals inside the residence, including BOURQUE and FRANK MCGUIRE. Inside BOURQUE's bedroom on the third floor, law enforcement agents found and seized about $2,500 in U.S. currency inside a safe, a single Oxycodone pill, four cellular phones, a "DEX-Corp" payroll check made out to MICHAEL BOURQUE, and three sets of keys.

17.    While police officers were preparing the search warrant for BOURQUE's residence, CW-1 informed investigators that in addition to BOURQUE's residence, BOURQUE also used a second location in Natick to store and distribute Oxycodone, an unlisted office space that BOURQUE rented under CW-1's name at 2 Summer Street, Suite 30, Natick, Massachusetts. CW-1 told investigators that CW-1 rented this office for BOURQUE, and paid the phone and utility bills, but that BOURQUE had possession of all the keys to the office space. CW-1 said that BOURQUE often went to this rented office space to distribute Oxycodone. CW-1 provided the police officers consent to search this location. Prior to the search, the door to the office was opened with one of the keys seized from BOURQUE's residence. A subsequent search of this location led to the seizure of 93 Oxycodone 80 mg pills (Oxycontin "80's," each containing 80 mg of Oxycodone) in a box on the floor, and a letter from the IRS addressed to MICHAEL BOURQUE.

18.     Following the discovery of the Oxycodone pills at the office at 2 Summer Street,

        BOURQUE was arrested and charged with possession of a Class A controlled substance.

        During BOURQUE's arrest and booking, BOURQUE indicated that he was the manager

        of DEX Corporation located at 197 West Central Street, in Natick, Massachusetts.[2]

**B.      DEX Corporation in Natick, Massachusetts**

19.     The investigation subsequently revealed that BOURQUE was the owner and operator of

        DEX Corporation, a shipping company located at the 197 West Central Street address in

        Natick.  Further, it was discovered that BOURQUE uses DEX Corporation (DEX-Corp)

        as a "front" for his drug trafficking operations.  BOURQUE uses a number of drug

        runners/couriers to make deliveries of Oxycodone pills who are also employees of the

        business including Christopher YANCEY and Frank McGUIRE.

20.     Since at least May 2012, members of the DEA, with law enforcement agents from

        Waltham, Newton, Arlington, Framingham, and Massachusetts State Police, have

        conducted both physical and video surveillance at DEX Corporation.  During this

        surveillance, agents have regularly observed BOURQUE and several other Target

        Subjects, who, as detailed below, are believed to be both drug customers of BOURQUE

        and drug runners/couriers for BOURQUE.  Agents have often seen  a significant number

        of vehicles, often five or six an hour, come and go from DEX Corporation.  Often times,

        the occupants of these vehicles entered the business for about 60 to 90 seconds, then

        departed the business and drove away.  Based on my training and experience, and prior

---

[2] The investigation also revealed that prior to the execution of the search warrant at BOURQUE's
residence, BOURQUE had given an additional 700 Percocet pills and more than $13,000 in cash
to another individual, ██████████ to hide from the police.

9

surveillance in numerous drug investigation, the kind of vehicle and foot traffic agents have observed coming in and out of DEX Corporation is consistent with sales of illegal drugs and appear to be unrelated to any legitimate shipping business of DEX-Corp.

21.     As recently as May 7, 2013, video surveillance at DEX-Corp, through a pole camera, has captured vehicle and foot traffic consistent with that which is described above. On May 7, 2013, both Corey ASSENCOA, at 7:33 a.m., and Christopher YANCEY, at 3:43 p.m., arrived at DEX-Corp, only to depart after a duration of minutes.

22.     The investigation has revealed that the Target Subjects comprise a network of individuals who have conspired, communicated, and coordinated to distribute Oxycodone; and who have in fact distributed Oxycodone. As further detailed below:

    a.     BOURQUE is involved in selling Oxycodone, and BOURQUE also facilitates drug deals between other dealers and customers. BOURQUE, who uses individuals to collect drug debts, has several people, including MCGUIRE, EHWA, and CHISHOLM, involved in the running of his drug business, which operates from DEX Corporation, his shipping business and a "front" for his drug operations.

    b.     BOURQUE distributes various quantities of Oxycodone to a group of drug customers and wholesale redistributors in the area of Waltham, Newton, Watertown, and Boston including HAGERNAARS, PANAGGIO, ASSENCOA, ROY, and yet unidentified others.

    c.     In February or March 2013, while BOURQUE's primary source of Oxycodone supply was out of the country, he arranged to purchase wholesale quantities of

Oxycodone from alternate sources.

## C.    Title III Wiretaps

23.    Interception of wire and electronic communication were authorized to and from:

    a.    BOURQUE's cellular phone, (508) 745-7149 ("Target Telephone #1" or "TT1") in an Order dated January 29, 2013;

    b.    BOURQUE's cellular phone, (781) 645-2255 ("Target Telephone #2" or "TT2"), in an Order dated February 14, 2013;

    c.    BOURQUE's cellular phone, (508) 202-8114 ("Target Telephone #3" or "TT3") in an Order dated February 14, 2013;

    d.    BOURQUE's cellular phone, (508) 283-0340 ("Target Telephone #4" or "TT4") in Orders dated March 27, 2013 and April 26, 2013; and

    e.    BOURQUE's cellular phone, (508) 250-6630 ("Target Telephone #5" or "TT#5") in Orders dated March 27, 2013 and April 26, 2013.

24.    In the descriptions and summaries of intercepted communications, enclosed in parentheses are comments and interpretations of law enforcement regarding the meaning of some of these phone calls and text messages; the comments and interpretations, as well as subsequent explanatory paragraphs, are based on my training and experience, as well as that of other law enforcement officers, and on the investigation to date. All indicated times are approximate.

## IV. SUMMARY OF EVIDENCE

25.    As further described in the paragraphs below, based on intercepted phone calls, surveillance including video surveillance at BOURQUE's place of business at DEX Corporation in Natick, Massachusetts and seizures of drug proceeds and Oxycodone, the investigation has revealed that BOURQUE, along with a network of whole-sale drug

11

customers and re-distributors of Oxycodone is involved in the distribution of large quantities of Oxycodone. BOURQUE also employs several individuals including Frank McGUIRE, Christopher YANCEY, Phillip GOOLST, and Barry GOOLST to make deliveries of Oxycodone pills and collect drug money.

**A.** **BOURQUE's Distribution of Oxycodone to Whole-Sale Drug Customer/Re-Distributors**

*1.*    *BOURQUE Distribute Oxycodone to Robert HAGENAARS*

26.    The investigation revealed that Robert HAGENAARS is one of BOURQUE's regular wholesale customers/re-distributors of Oxycodone who also assisted BOURQUE in obtaining supplies of Oxycodone. As further described below, during a series of intercepted calls on January 30, 2013, BOURQUE arranged to meet HAGENAARS in Waltham in order to sell HAGENAARS 125 Oxycodone pills. After these calls, agents observed BOURQUE meet with HAGENAARS near a Dunkin Donuts in Waltham and engage is what is believed to have been a hand-to-hand transaction of 125 pills of Oxycodone.

27.    On January 30, 2013, at 5:17 p.m., agents intercepted an incoming phone call to BOURQUE (on TT#1) from a male believed to be Robert HAGENAARS at (781) 330-2813, subscribed to and believed to be used by HAGENAARS (Hagenaars Telephone #1). During the phone call, BOURQUE stated, "But you know what, you're going to meet me. You know where that Dunkin' Donuts is up on Third Avenue there?" HAGENAARS replied, "Yeah, I'll meet you there." BOURQUE stated, "At ten of seven." HAGENAARS requested, "Ah, bring um, a buck and a quarter (125 Oxycodone

12

pills)." BOURQUE responded, "OK." HAGENAARS asked, "What are we doing on

that? Twenty-two (dollars per pill)?" BOURQUE replied, "Yeah, that's fine. I'll call

you when I'm on my way."

28.    At 6:30 p.m., law enforcement established surveillance in the area of the Dunkin' Donuts

parking lot at 75 Third Avenue in Waltham. At 6:40 p.m., surveillance officers observed

a Toyota Rav4 (Massachusetts registration 664FH1), driven by HAGENAARS, pull into

the Dunkin' Donuts parking lot; HAGENAARS then exited the Toyota and walked into a

D'Angelo's restaurant next door to Dunkin' Donuts.[3] At 6:50 p.m., surveillance officers

observed a black BMW (Massachusetts registration 993SX8), driven by BOURQUE,[4]

park next to HAGENAARS' Toyota. Within seconds, HAGENAARS exited the

restaurant, approached the passenger side of BOURQUE's BMW, opened the BMW's

front passenger side door, and leaned into the vehicle while retrieving something from his

jacket pocket. Within a minute, HAGENAARS left the area of BOURQUE's BMW and

returned directly to the restaurant. BOURQUE remained seated in his BMW for two

minutes, then exited the vehicle, entered the restaurant, and met with HAGENAARS

inside the restaurant. After five minutes, BOURQUE and HAGENAARS exited the

restaurant, entered their vehicles, and left the area.

29.    Based on my training and experience, as well as my participation in this investigation, I

---

[3] At 6:45 p.m., agents intercepted a series of text messages from HAGENAARS (on Hagenaars
Telephone #1) to BOURQUE (on TT#1). During the text message exchange, HAGENAARS
wrote, "I[']m in d[']angelos getting [f]oo[d]". BOURQUE responded, "K". At 6:49,
BOURQUE wrote, "Here."

[4] The vehicle, a 2012 BMW Model 535xi, is registered to BOURQUE at 95 Robbins Street,
Waltham, Massachusetts, where BOURQUE's mother and sister reside.

believe that BOURQUE and HAGENAARS met in the Dunkin' Donuts parking lot,

where HAGENAARS provided purchase money for the requested Percocet to

BOURQUE in BOURQUE's BMW.  BOURQUE then provided the 125 Percocet pills to

HAGENAARS while both men were in the restaurant.

30.   On February 7, 2013, at 9:57 a.m., agents intercepted a text message from BOURQUE

(on TT#1) to a male believed to be HAGENAARS at Hagenaars Telephone #1.

BOURQUE wrote, "21 If u come e[v]ery day[.]"  Based on my training and experience,

as well as my participation in this investigation, I believe that BOURQUE was offering to

sell Percocet to HAGENAARS for $21 per pill ("21") if HAGENAARS bought an

increased volume of Percocet, and did so more frequently ("If u come e[v]ery day").

   2.   *BOURQUE Meets with HAGENAARS, Barry GOOLST, and CHISHOLM
        to Distribute Oxycodone*

31.   As further described below, during a series of intercepted calls on February 18, 2013,

BOURQUE arranged to deliver Oxycodone to HAGENAARS, Brian CHISHOLM and

Phillip GOOLST.  The investigation has revealed that CHISHOLM is one of

BOURQUE's regular whole-sale Oxycodone customers/re-distributors, and that

BOURQUE uses Phillip GOOLST and his brother Barry GOOLST as runner/couriers to

deliver Oxycodone for BOURQUE.  During the course of surveillance, agents then

observed BOURQUE meet with Phillip GOOLST's brother (Barry GOOLST) and

HAGENAARS to sell the Oxycodone.  After meeting with Phillip GOOLST and

HAGENAARS, BOURQUE met with CHISHOLM to distribute the Oxycodone that

CHISHOLM had requested.

32.   On February 18, 2013, at 3:30 p.m, agents intercepted an incoming phone call to
      BOURQUE (on TT#3) from a male believed to be Brian CHISHOLM at (781) 330-5977,
      believed to be used by CHISHOLM (Chisholm Telephone #1). During the call,
      CHISHOLM stated, "I need like 100 (Oxycodone pills), at least." BOURQUE
      responded, "Wow. I mean I'm very low. What do you have that is done?" CHISHOLM
      answered, "I got, I got done right now but the kid's coming to get something right now
      and another 50 done right now so at least 75 right now. And I got 50 on me."
      BOURQUE asked, "Say it again? You are 50 and he's coming to get the 50?"
      CHISHOLM stated, "Yeah, someone's taking that 50 and then someone's offered to
      come to 25 or 50." Later in the conversation, BOURQUE stated, "So if I bring you 50,
      you should be good, right?" CHISHOLM agreed, and BOURQUE stated, "All right. I'll
      see you soon."

33.   At 3:40 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a
      male believed to be HAGENAARS at Hagenaars Telephone #1. HAGENAARS stated,
      "What I'm saying, all [I] got on me is 1100 bucks. So until I see him, I didn't know if
      you wanted to do 50 now, and I can see your buddy later tonight. At least I can get a
      couple now." BOURQUE stated, "Ya. I'll see now and if you need to see me later,
      that's fine." Later in the conversation, BOURQUE stated, "All right. I'm gonna come
      see you right now. Meet me over, ah, at the spot there in like 15 to 20 minutes. I'll be
      over there."

34.   At 3:44 p.m., agents intercepted an incoming phone call to BOURQUE (on TT#3) from a
      male believed to be Phillip GOOLST at (339) 970-1971, believed to be used by Phillip

15

GOOLST (P. Goolst Telephone #1). During the call, BOURQUE asked, "What's the number, Weebs?" Phillip GOOLST stated, "Oh, it's a 20." GOOLST then asked, "When, when...where are you...wanna meet?" BOURQUE replied, "I'm getting to the spot right now." GOOLST asked, "Where?" BOURQUE answered, "Where I always meet you. Over at...." GOOLST stated, "Okay. I'm heading out your way now."

35.   At 4:06 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be HAGENAARS at Hagenaars Telephone #1. BOURQUE asked, "Where you at?" HAGENAARS responded, "I'm up to the street." BOURQUE asked, "On the parking lot?" HAGENAARS stated, "Across from the Hess. Across from the Hess." BOURQUE stated, "Ah, okay. I see you. See me at...." HAGENAARS responded, "Yeah, I got you. I'm following you." BOURQUE stated, "Follow me up to this parking lot."

36.   At 4:07 p.m., surveillance officers observed BOURQUE, driving his 2012 BMW, pass the Hess gas station on Auburn Street in Newton, followed by two vehicles. At 4:09 p.m., surveillance officers observed BOURQUE meeting with Barry GOOLST (Phillip "Weebs" GOOLST's brother). Surveillance officers also observed BOURQUE meeting with HAGENAARS.

37.   At 4:09 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be CHISHOLM at Chisholm Telephone #1. BOURQUE asked, "You home?" CHISHOLM answered, "Yeah. Just come in quiet because I'm on the phone with Kathy. All right?" BOURQUE replied, "All right. Bye." CHISHOLM ended, "Bye." Minutes later at 4:13 p.m., surveillance officers observed BOURQUE's 2012

16

BMW in the driveway of CHISHOLM's residence at 30 Prairie Avenue, Newton, MA (Target Location #3).

38.     Based on my training and experience, I believe that BOURQUE agreed to supply CHISHOLM with an amount of Oxycodone. Prior to meeting CHISHOLM, BOURQUE met with HAGENAARS and Barry GOOLST to provide each of them with Oxycodone. After meeting HAGENAARS and Barry GOOLST, BOURQUE met CHISHOLM at CHISHOLM's residence to provide the promised Oxycodone to CHISHOLM.

   3.     *BOURQUE's Distribution of Oxycodone to John KINNEY, Mark EHWA, Raymond PANAGGIO, and Corey ASSENCOA*

39.     As further described below, during a series of calls on February 23, 2013, BOURQUE arranged to meet with John KINNEY in Lexington, Massachusetts to distribute Oxycodone to KINNEY. The investigation revealed that KINNEY was one of BOURQUE's regular Oxycodone whole-sale customers/re-distributors. Following the intercepted phone calls, agents observed BOURQUE and KINNEY engage what is believed to have been a hand-to-hand drug transaction.

40.     During another transaction, BOURQUE enlisted another one of his drug customers, Mark EHWA, to deliver Oxycodone to Raymond PANAGGIO. The investigation revealed that PANAGGIO was one of BOURQUE's more regular drug customers who sought to purchase Oxycodone from BOURQUE on an almost daily basis, and who was involved in the re-distribution of Oxycodone.

41.     On February 23, 2013, at 11:16 a.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be John KINNEY at (617) 866-0324,

17

believed to be used by KINNEY (Kinney Telephone #1). BOURQUE asked if KINNEY was at Margarita's restaurant. KINNEY stated that he was not, but that he would turn around and meet BOURQUE at Margarita's.

42.     At 11:16 a.m., surveillance officers observed BOURQUE drive his 2012 BMW into the Margarita's parking lot in Lexington, Massachusetts. At 11:20 a.m., surveillance officers observed a pickup truck with "Kinney Electric" on the truck. The surveillance officers observed BOURQUE, in his BMW, drive in the direction of the pickup truck. BOURQUE positioned his BMW so that BOURQUE's driver's side window and the driver's side window of the pickup were side-by-side. The surveillance officers observed KINNEY, the driver of the pickup truck, and BOURQUE extend their arms out of the windows and exchange items. After the exchange, both men departed in their respective vehicles.

43.     Between 12:06 p.m. and 12:33 p.m., agents intercepted several text messages between BOURQUE (on TT#3) and a male believed to be KINNEY at Kinney Telephone #1. The exchange is detailed below:

| | |
|---|---|
| KINNEY | Hey there were only 140 |
| BOURQUE | Thats weird okay did u double check |
| KINNEY | Ya triple counted |
| BOURQUE | K I giue to u sorry |
| KINNEY | No prob |

44.     Based on my training and experience, as well as my participation in this investigation, I believe that KINNEY purchased an amount of Oxycodone from BOURQUE, but that BOURQUE provided fewer pills than KINNEY had paid for.

45.     At 2:30 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a

male believed to be Raymond PANAGGIO at (617) 699-7399, subscribed to Anthony

Panaggio (Panaggio Telephone #1). At the start of the call, BOURQUE said, "That's so

crazy, I was just calling you and you're texting. I gotta text him right now. How many

(Oxycodone pills) are you looking for?" PANAGGIO answered, "Two 15's."

BOURQUE clarified, "15 at 30 bucks?" PANAGGIO said, "Well, I gotta take care of a

few people." BOURQUE replied, "Oh, okay. I'll tell him. Bye." Based on my training

and experience, as well as my participation in this investigation, I believe that

BOURQUE asked PANAGGIO how many Oxycodone pills PANAGGIO needed, and

PANAGGIO in turn indicated that he was going to re-distribute the pills to others ("Well

I gotta take care of a few people").

46.   At 2:32 p.m., agents intercepted an text message from BOURQUE (at TT#3) to a male

believed to be Thomas EHWA at (781) 839-0776, believed to be used by EHWA (Ehwa

Telephone #1). BOURQUE wrote, "Wants 15 his nu[mb]er is 617 699 7399 (Panaggio

Telephone #1)." Based on my training and experience, as well as my participation in this

investigation, I believe that BOURQUE asked EHWA to call PANAGGIO in order for

EHWA to deliver Oxycodone pills to PANAGGIO.

47.   On February 24, 2013, at 10:36 a.m., agents intercepted an incoming phone call to

BOURQUE (on TT#3) from a male believed to be PANAGGIO at Panaggio Telephone

#1. At the beginning of the call, BOURQUE told PANAGGIO, "No word yet, but did my

buddy (referring to EHWA) ever meet you last night?" PANAGGIO replied, "Ya, yup...I

just wanted that to take care of a few people." BOURQUE said, "Ah, ya, that's cool, all

right, if I hear anything, I will call you." Based on my training and experience, as well as

my participation in this investigation, I believe that PANAGGIO's reference to "tak[ing] care of few people" indicated that PANAGGIO was redistributing Oxycodone pills that PANAGGIO obtained from BOURQUE.

48.   On February 25, 2013, at 8:18 a.m., agents intercepted an incoming phone call to BOURQUE (on TT#3) from a male believed to be Corey ASSENCOA at (508) 726-3879, subscribed to Angelo Ayala and believed to be used by ASSENCOA (Assencoa Telephone #1). As further described below, the investigation revealed that ASSENCOA is one of BOURQUE's regular whole-sale Oxycodone drug customers and re-distributors. At the start of the call, BOURQUE stated, "I could have got something yesterday for 25 but then, I mean, what am I gonna do with that, dude? You know what I mean? If I get them for 25, I'm gonna have to sell them for...you know...." ASSENCOA replied, "Ya, almost 30." BOURQUE said, "No, I do it if you want to pay 28, if I can't get anything. I mean, I don't even know he has anything and plus I hate the kid that I'd have to go through. He's a fuckin' punk." Moments later, BOURQUE said, "I'll try, I'll try today, I'll try. Do you have any [U/I]." ASSENCOA said, "No, dude, I got, I got a couple left ya...I got a couple dude there gonna be gone soon you know what I mean...." A short time later, BOURQUE again said, "I know, I know I can get 15's for 30, I mean 15 bucks a piece (referring to Percocet 15 mg pills that typically sell at price of about $15 per pill, instead of about $25 per pills for a Percocet 30 mg pill) later on if you really need it." BOURQUE then said he was going to have "Frank" (McGUIRE) do it, which agents believe referred to delivery of the drugs.

49.   As further described below, during a series of intercepted calls, BOURQUE sought to

collect drug money owed to him from EHWA, CHISHOLM, and Phillip GOOLST.

50.     On February 25, 2013, at 9:13 a.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be EHWA at Ehwa Telephone #1. During

the call, BOURQUE said he was "still waiting to hear" and asked EHWA, "Did you make

out on that 'grizzies' (marijuana)? Did you get any back?" BOURQUE then asked if

EHWA had any money (from a prior drug transaction), and asked, "Do you think you can

give me some money off the bill?" EHWA replied, "Ahh ya, I should be able to do that

later today." Based on my training and experience, as well as my participation in this

investigation, I believe that BOURQUE asked EHWA for money that was still owed to

BOURQUE from a prior drug transaction in which BOURQUE provided EHWA

Oxycodone pills on credit.

51.     On February 25, 2013, at 11:17 a.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be CHISHOLM at Chisholm Telephone #1.

BOURQUE told CHISHOLM, "Well, I wanna grab that money so I can grab as many as I

can tomorrow. So what do you have on you?" CHISHOLM replied, "I got like 600 I

think on me." BOURQUE said, "I'll probably come by or send Barry by once you get

home to grab it all plus Joey's too." Based on my training and experience, as well as my

participation in this investigation, I believe that BOURQUE asked CHISHOLM for

money from a previous drug transaction; CHISHOLM indicated that he had $600 to give

to BOURQUE; and BOURQUE indicated that he would send "Barry" (GOOLST) to pick

up the money from CHISHOLM.

52.     On March 4, 2013, at 4:02 p.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be Phillip GOOLST at P. Goolst Telephone #1. During the call, BOURQUE and Phillip GOOLST talked about money that GOOLST owed BOURQUE from a prior deal. BOURQUE said the cost was "27 (dollars per pill)."

4.   *BOURQUE Arranges to Distribute Oxycodone Pills to Brian CHISHOLM, Raymond PANAGGIO, and Mark EHWA*

53.   On March 2, 2013, at 3:07 p.m., BOURQUE made an outgoing call over TT#3 to a male believed to be PANAGGIO at Panaggio Telephone #1. During the brief call, BOURQUE asked PANAGGIO, "How many you want?" PANAGGIO replied, "20." BOURQUE said, "Ok, see you soon. Bye." In this call, agents believe that PANAGGIO asked BOURQUE to purchase 20 Oxycodone pills.

54.   At around 3:25 p.m., DEA TFO Joseph Connors observed BOURQUE arrive in the area of Auburn Street in Newton, Massachusetts in his BMW. BOURQUE pulled into a small M.B.T.A. parking lot located at the corner of Auburn and Melrose Streets in Newton. At 3:27 p.m., TFO Connors observed BOURQUE pull his BMW next to a silver 2008 Dodge Charger bearing MA registration 483-EV7, registered to Raymond Panaggio. TFO Connors observed an individual known to him as PANAGGIO exit the Charger and walk to the driver's side window of BOURQUE's vehicle. TFO Connors observed what appeared to be a quick exchange between BOURQUE and PANAGGIO at the window and both left the lot quickly, each in their respective cars.

55.   On March 2, 2013, at 3:32 p.m., BOURQUE made an outgoing call over TT#3 to a male believed to be EHWA at Ehwa Telephone #1. During the brief call, EHWA told BOURQUE, "I think I just saw you pull over up the street." BOURQUE replied, "Yup,

yup, yup I am waiting for you." EHWA said, "I am backing out." A short time later, during call at 3:42 p.m., BOURQUE told EHWA that he did not like driving through Waltham and explained, "Because I see Ray (PANAGGIO), you and Chiso (CHISHOLM) right over there boom-boom. And that's it." EHWA asked, "Ya, you don't like being in Waltham?" BOURQUE replied, "No not with shit [drugs] on me."

56.     At 3:32 p.m., TFO Connors observed BOURQUE stop on Melrose Street just in from Auburn Street in Newton, in front of a gray electrical van labeled "EWHA Electric," though TFO Connors was unable to observe the license plate of the van. A white male exited the van and through a Massachusetts registry drivers license photo, TFO Connors was able to positively identify the individual as EHWA. TFO Connors observed EHWA walk to the driver's side window of BOURQUE's vehicle and observed an exchange take place between BOURQUE and EHWA. At 3:34 p.m., TFO Connors observed EHWA return to his van and travel north on Melrose Street.

57.     On March 2, 2013, at 5:28 p.m., BOURQUE sent a text message over TT#3 to a male believed to be ASSENCOA at Assencoa Telephone #1. BOURQUE wrote, "Left u 45 with frank should haue [sic] more tomorrow." In this text message, agents believe that BOURQUE was indicating to ASSENCOA that he left a supply of Oxycodone pills to give to ASSENCOA with MCGUIRE.

58.     On March 4, 2013, at 3:20 p.m., BOURQUE made an outgoing call over TT#3 to a male believed to be CHISHOLM. During the call, BOURQUE told CHISHOLM that has "something" (Oxycodone) for CHISHOLM for tomorrow.

59.     On March 6, 2013, at 12:01 p.m., BOURQUE made an outgoing call over TT#3 to a male

believed to be CHISHOLM.  During the call, BOURQUE told CHISHOLM that he might

have "75 at 25" (75 Oxycodone pills for $25 per pill) for CHISHOLM.  CHISHOLM said

he wanted them.  BOURQUE said he would call him back.

     5.     *BOURQUE Distributes Oxycodone to Michael ROY at DEX-Corp*

60.    At 6:19 p.m. on April 18, 2013, agents intercepted a series of phone calls and text

messages between BOURQUE (on TT#4) and a male believed to be ROY at Roy

Telephone #1.  ROY texted, "Be there 15 mins".  Four minutes later, at 6:23 p.m.,

BOURQUE called ROY.  During the phone call, ROY stated that he was ten minutes

away, and that he wanted "50," believed by law enforcement to be a reference to an

amount of Oxycodone pills.  Fourteen minutes later, at 6:37 p.m., BOURQUE again

called ROY.  ROY stated that he would be there (and arrive) in one minute (to meet

BOURQUE).  Based on my training and experience, as well as my participation in this

investigation, I believe that BOURQUE arranged to sell narcotics to ROY, met him, and

in fact did sell, 50 pills of Oxycodone to ROY during an in-person meeting.

61.    At 2:43 p.m. on April 21 2013, agents intercepted an incoming phone call  to BOURQUE

(on TT#4) from a male believed to be ROY at Roy Telephone #1.  ROY asked, "Are you

at the shop (DEX-Corp)?"  BOURQUE asked, "Where are you 'cause I got to fly."  ROY

asked, "Can you just leave them with Frank (MCGUIRE) 'cause it's gonna be a couple of

hours?"  BOURQUE stated, "No, he's not going to be...he's not around."  ROY

responded, "Fuck!"  BOURQUE later stated, "The only thing I can do is see what I can

do.  What did you want?"  ROY replied, "I'm saying '50.'"  BOURQUE then stated,

"Text me up in ahh...on the other one, on the other one and I'll see, I'll have, I'll do

something for you."

62.   Based on my training and experience, as well as my participation in this investigation, I
      believe that ROY asked BOURQUE to leave Oxycodone pills with MCGUIRE at DEX-
      Corp ("Can you just leave them with Frank 'cause it's gonna be a couple of hours?").
      When BOURQUE responded that MCGUIRE would not be at DEX-Corp, ROY
      expressed frustration ("Fuck!").   BOURQUE stated that he would see if BOURQUE
      could provide the pills to ROY in another way ("The only thing I can do is see what I can
      do").   ROY asked for 50 Oxycodone pills ("I'm saying '50'").   BOURQUE asked ROY
      to text him on a separate phone ("Text me up in ahh...on the other one"), and BOURQUE
      would provide pills to ROY ("I'll do something for you").

      6.      *BOURQUE Distributes Oxycodone to Corey ASSENCOA and Raymond
              PANAGGIO*

63.   On April 5, 2013, at 10:48 a.m., agents intercepted an incoming phone call to BOURQUE
      (on TT#5) to a male believed to be ASSENCOA at Assencoa Telephone #1.   During the
      call, BOURQUE offered Oxycodone to ASSENCOA for $27 per pill.   BOURQUE
      continued, "I just got 140 of them (Oxycodone) from somebody who just wanted to get
      rid of them.   I figured I just grab them.   I know I can get rid..I know one kid that will
      basically pay 29 or 30 (dollars) for them."   ASSENCOA stated, "Yea, ya know, dude, I
      will just take them.   I just take them."   BOURQUE stated, "Dude, all you need to do is
      just take 35 (dollars).   That's it.   You don't like it?   Fuck yourself, you know what I
      mean?"   Toward the end of the conversation, BOURQUE stated, "I'll see ya at 12:30."
      Based on my training and experience, ASSENCOA agreed to purchase Oxycodone at $27

per pill from BOURQUE.  During the call, BOURQUE advised that ASSENCOA could

then resell the pills to ASSENCOA's customers for $35 a piece.

64.    At 12:32 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#5) to a

male believed to be ASSENCOA at Assencoa Telephone #1.  During the call,

BOURQUE asked, "Where are you?"  ASSENCOA answered, "I [am] waiting for you."

ASSENCOA stated, "12:31.  You late."  BOURQUE stated, "I'll be there in one minute."

65.    Law enforcement established surveillance at DEX-Corp at 12:20 p.m.  At 12:25 p.m.,

surveillance officers observed ASSENCOA arrive by car at DEX-Corp, exit his 2004

GMC truck, and enter DEX-Corp.  At 12:33 p.m., surveillance officers observed

BOURQUE arrive at DEX-Corp in his 2012 BMW, exit his vehicle, and enter the shop.

Approximately 13 minutes later, at 12:47 p.m., surveillance officers observed

ASSENCOA exit DEX-Corp, enter his GMC truck, and leave from DEX-Corp.

66.    Based on my training and experience, as well as my participation in this investigation, I

believe that after ASSENCOA agreed to purchase Oxycodone from BOURQUE at $27

per pill, ASSENCOA and BOURQUE met at DEX-Corp to consummate the narcotics

transaction.

67.    At 6:14 p.m. on April 12, 2013, agents intercepted an outgoing phone call  from

BOURQUE (on TT#5) to a male believed to be PANAGGIO at Panaggio Telephone #1.

PANAGGIO asked, "Did you (get Oxycodone pills)?"  BOURQUE stated, "Ya, but

they're 26 (dollars per pill) to you 'cause they're 25 (dollars) to me.  It's like a joke, ya

know what I mean?  So, but I did, I did grab some, well, I'm grabbing them in like ten

minutes but, like the kid's on his way.  He just called me so."  Based on my training and

26

experience, as well as my participation in this investigation, I believe that PANAGGIO

asked BOURQUE if BOURQUE had Oxycodone for sale. BOURQUE stated that he

would have pills shortly, that BOURQUE would be paying $25 per pill, and that the cost

for PANAGGIO would be $26 per pill.

68.     At 6:35 p.m. on April 12, 2013, agents intercepted an incoming phone call to

BOURQUE (on TT#5) from a male believed to be ASSENCOA at Assencoa Telephone

#1. During the phone call, BOURQUE stated, "[Y]ou were paying 24 (dollars per pill)

for 90% of the time and your only paying 26 (dollars) now? That's like not a lot [of]

difference." ASSENCOA stated, "I'm not gonna complain." BOURQUE stated, "I know

you're not, but everyone is paying 28 so...." Based on my training and experience, as

well as my participation in this investigation, I believe that BOURQUE and ASSENCOA

were discussing current prices for Oxycodone.

69.     Between 10:14 a.m. and 10:37 a.m. on April 14, 2013, agents intercepted several wire

and text messages between BOURQUE (on TT#5) and a male believed to be

PANAGGIO at Panaggio Telephone #1. At 10:13 a..m., BOURQUE called PANAGGIO

and asked PANAGGIO if PANAGGIO was ready to meet BOURQUE at the Hess gas

station at 10:30 a.m. At 10:18 a.m., PANAGGIO texted BOURQUE and wrote, "50". At

10:34 a.m., BOURQUE called PANAGGIO and asked where PANAGGIO was.

PANAGGIO stated that he was on the way. PANAGGIO also stated that he had most of

the money, but was missing some. BOURQUE stated that was fine. At 10:36 a.m.,

BOURQUE again called PANAGGIO. BOURQUE stated that if they could do this for a

couple of weeks, they could make some money. PANAGGIO stated that he had given

27

BOURQUE $1140, so PANAGGIO stated he still owed BOURQUE $160. BOURQUE

stated that this new (Oxycodone) connection should be consistent.

70.     Based on my training and experience, as well as my participation in this investigation, I

believe that during this series of communications, BOURQUE arranged to sell 50

Oxycodone pills to PANAGGIO, and met at the Hess gas station to consummate the

narcotics deal. After the transaction, BOURQUE called PANAGGIO to let him know

that they could begin to make money and that the new source of supply would likely be

consistent.

71.     At 11:10 a.m. on April 20, 2013, agents intercepted an outgoing phone call from

BOURQUE (on TT#5) to a male believed to be PANAGGIO at Panaggio Telephone #1.

The conversation is excerpted below:

            PANAGGIO:  Hello.
            BOURQUE:   I'll see you there in fifteen?
            PANAGGIO:  Can you give me twenty?
            BOURQUE:   Twenty. Fly
            PANAGGIO:  I can leave here in five minutes [U/I]. I don't want you waiting
                       there.
            BOURQUE:   Bye. Hey, what do you want, five-O right?
            PANAGGIO:  Yes, please.
            BOURQUE:   You have everything, right?
            PANAGGIO:  Yes.
            BOURQUE:   Alright, bye

72.     Based on my training and experience, as well as my participation in this investigation, I

believe that PANAGGIO arranged to meet BOURQUE, who then sold PANAGGIO 50

Oxycodone pills.

**B.**   **BOURQUE Employs Runners to Distribute Oxycodone Pills and Collect Drug Proceeds**

73.   The investigation has revealed that BOURQUE uses several individuals, including Christopher YANCEY, Phillip GOOLST, Barry GOOLST, and Frank McGUIRE, to act as runners/drug couriers who, on regular almost daily basis, deliver Oxycodone pills for BOURQUE to BOURQUE's drug customers and collect drug money for BOURQUE

74.   For example, on February 20, 2013, at 1:33 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be Barry GOOLST at (781) 330-4148 (B. Goolst Telephone #1). During the call, BOURQUE asked B. GOOLST if he wanted to make some money. GOOLST asked, "How much, well, well what do you want me to do?" BOURQUE said, "I just need you to go see...umm...ahh...come out...see me...go see ███████ and Ray and, ahh, come back and I'll pay you $50 plus gas." GOOLST replied, "Fifty, okay, cool, that's fine."

75.   Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE asked GOOLST if he wanted to make money delivering Oxycodone to two of BOURQUE's customers, ███████ and PANAGGIO ("come out...see me...go see ███████ and Ray and, ahh, come back and I'll pay you $50 plus gas.")

76.   At 1:35 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be ███████ at ███████ (███████ Telephone #1), one of BOURQUE's drug customers. During the call, BOURQUE told ███████ "Barry" (GOOLST) was going to see ███████ around 3:30 p.m. BOURQUE then said, "All

right, I'm gonna have you wrap that thing up and give it to him. Okay." ███████ replied,

"Ya. I'll put it in an envelope or something," referring, agents believe, to the money that

███████ would give Barry GOOLST for the Oxycodone.

77.    On February 27, 2013, at 3:17 p.m., agents intercepted an incoming phone call to

BOURQUE (on TT#3) from a male believed to be Christopher YANCEY at (774)

292-1382, subscribed to YANCEY (Yancey Telephone #1). During the call, YANCY

asked, "What's up?" BOURQUE replied, "Nothing. I'm...nothing. Maybe tomorrow. He

said today but they got caught in the weather or some fucking thing. So he said tomorrow

. . . Um, when are you gonna have the rest of that money?" YANCEY said, "Next week."

BOURQUE replied, "Huh? . . . You know, you forced me to give you less and less

because you do this, right. You know that right?" BOURQUE complained, "I'm not a

bank, you've had twelve hundred dollars for a month almost going on three weeks and

now it's down to eight-fifty or whatever it is eight hundred. I mean it's ridiculous. It is,

Chris. It shouldn't happen." Based on my training and experience, as well as my

participation in this investigation, I believe that BOURQUE reminded YANCEY that he

decreased his monthly pay - either in cash or Oxycodone pills - to act as a drug

runner/courier for BOURQUE.

78.    On February 28, 2013, at 1:13 p.m., agents intercepted an incoming phone call to

BOURQUE (on TT#3) from a male believed to be Phillip GOOLST at P. Goolst

Telephone #1. GOOLST said he had not heard the phone, and told BOURQUE, "I'm

gonna call him right now and have him send the money." BOURQUE replied, "Well

wait 'til I get 'em in my hands first but there, there not 24, they're 26," (referring to the

price of the Oxycodone pills – $26 per pill instead of $24 per pill). BOURQUE further

told GOOLST, "When I get 'em in my hand, I'll tell you to call the kid. I don't want him

to send the money until I have them in my hand." Based on my training and experience,

as well as my participation in this investigation, I believe that BOURQUE was having

Phillp GOOLST collect drug money for BOURQUE at a price of $26 per pill, but was

instructing GOOLST to not take the money until BOURQUE had possession of the pills

("I don't want him to send the money until I have them in my hand").

79.     A short time later, at 2:22 p.m., agents intercepted an outgoing phone call from

        BOURQUE (on TT#3) to a male believed to be Phillip GOOLST at P. Goolst Telephone

        #1. At the beginning of the call, BOURQUE told GOOLST, "Make the call." GOOLST

        replied, "I already did, he sent the money, I just gotta go pick it up at Western Union . . .

        But the thing is, I have to be at work at three o'clock ah can Barry (referring to

        GOOLST's brother, Barry GOOLST) to pick em up . . . Hello." BOURQUE replied, "I

        need the money, Phil." Moments later, during a call at 2:23 p.m., BOURQUE told

        GOOLST to "go get Ray's money for me." Based on my training and experience, as well

        as my participation in this investigation, I believe that BOURQUE instructed GOOLST to

        collect drug proceeds from several individuals including "Ray," who is believed to be

        PANAGGIO.

80.     Minutes later, at 2:31 p.m., agents intercepted an outgoing phone call from BOURQUE

        (on TT#3) to a male believed to be YANCEY at Yancey Telephone #1. At the beginning

        of the brief call, BOURQUE asked YANCEY, "You got people waiting?" YANCEY

        replied, "Of course I do, you know that." BOURQUE told YANCEY to get him a coffee

31

and head to the shop. Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE had just picked up a supply of Oxycodone pills; that BOURQUE was returning to DEX-Corp to deliver pills to his customers; and that BOURQUE asked YANCEY if there were drug customers waiting for him.

81.   On February 28, 2013, at 4:57 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be Phillip GOOLST at P. Goolst Telephone #1. At the beginning of the call, GOOLST told BOURQUE that he was in the cab, and BOURQUE asked, "All right, so what did Ray give ya?" GOOLST replied, "Ah, he gave me for 20." BOURQUE asked, "And what about you?" GOOLST said, "Ah 25, so 45 .. . I'll see you in about fifteen minutes." Based on my training and experience, as well as my participation in this investigation, I believe that GOOLST informed BOURQUE that he had collected $2,500 from PANAGGIO from a prior drug transaction.

82.   On March 2, 2013, at 2:50 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be Phillip GOOLST at P. Goolst Telephone #1. During the call, Phillip GOOLST mentioned the location of "Cape Code," told BOURQUE he wanted to do it first, and asked if there would be enough. GOOLST then said he wanted to meet BOURQUE first thing in the morning for "45." BOURQUE said he should be able to, and told GOOLST he would be able to do it tonight. BOURQUE then said he was supposed to get more tomorrow. Based on my training and experience, as well as my participation in this investigation, I believe that GOOLST told BOURQUE that he wanted to make his drug deliveries to Cape Cod first, and asked BOURQUE if there was enough Oxycodone pills.

83.   As further described below, during a series of calls starting around March 2, 2013,

BOURQUE arranged to send Barry GOOLST to deliver Oxycodone to Brian

CHISHOLM.

84.   On March 2, 2013, at 2:19 p.m., BOURQUE made an outgoing call over TT#3 to a male

believed to be CHISHOLM at Chisholm Telephone #1. During the call, BOURQUE told

CHISHOLM to call "those crumbs" and see if they still want it (referring to Oxycodone

pills). CHISHOLM asked how much, and BOURQUE replied "25" a piece ($25 per pill).

CHISHOLM said he would get rid of "100" right now. BOURQUE said he would send

"Barry" (Barry GOOLST) out, and told CHISHOLM to call him back and let him know.

85.   On March 4, 2013, at 5:30 p.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be Barry GOOLST at B. Goolst Telephone

#1. During the call, BOURQUE instructed Barry GOOLST to make a delivery of

Oxycodone to a drug customer named ████████ in Waltham. During a call at 5:47 p.m.,

BOURQUE gave Barry GOOLST more precise directions. Then, during a call at 6:55

p.m., Barry GOOLST informed BOURQUE that two girls were getting arrested in the

parking lot, and that GOOLST needed to wait to make the delivery of drugs.

86.   On March 4, 2013, at 11:53 a.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be Frank MCGUIRE at (781) 530-0878,

(McGuire Telephone #1). During the call, BOURQUE asked MCGUIRE, "All right, you

gonna take a ride with me again...we're gonna leave in an hour." BOURQUE further

explained, "I'll throw you some, I'll throw, I'll whip some money off your bill this time

like 'cause I'm just nervous to go by myself...." Based on my training and experience, as

33

well as my participation in this investigation, I believe that BOURQUE asked MCGUIRE to accompany him during a pick up of drugs, and offered to pay MCGUIRE for the trip.

**C.      BOURQUE Contacts Alternative Sources of Supply for Oxycodone Pills**

87.     In February to early March 2013, BOURQUE indicated to his drug associates that he was having a difficult time obtaining supplies of Oxycodone pills because his regular source of Oxycodone supply was unavailable. As a result, BOURQUE asked some of his regular drug customers, including CHISHOLM, if they were able to obtain supplies of Oxycodone pills. During several calls, BOURQUE also indicated that he could obtain Oxycodone pills at a higher price, but preferred to wait for, agents believe, his regular supplier of Oxycodone.

> *1.      Calls with Brian CHISHOLM, Robert HAGENAARS, Michael ROY, Mark EHWA, Corey ASSENCOA and John KINNEY About Obtaining Supplies of Oxycodone*

88.     On February 24, 2013, at 11:32 a.m., agents intercepted an incoming phone call to BOURQUE (on TT#3) from a male believed to be CHISHOLM at Chisholm Telephone #1. At the beginning of the call, CHISHOLM asked BOURQUE, "[A]re you going to see this kid today, because people are calling me." BOURQUE replied, "Dude, Bri, bri,bri you know how it works dude. It works by once the kid calls me its done." BOURQUE then said, "[W]hy don't you call the kid from Brockton?" CHISHOLM said, "Because he is not around." BOURQUE replied, "He is never around." Based on my training and experience, as well as my participation in this investigation, I believe that CHISHOLM asked BOURQUE if he had heard from his supplier of Oxycodone, because CHISHOLM had requests for drugs from his own drug customers ("[A]re you going to see this kid

today, because people are calling me").

89.   On February 24, 2013, at 11:24 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be HAGENAARS at Hagenaars Telephone #1. During the brief call, BOURQUE asked, ". . . can you do anything today?" HAGENAARS replied, "Ah, I don't know, let me find out. I was supposed to have it last night, and he never came back for me." BOURQUE said, "Ok well let me know. I will grab five or something (believed to be 500 pills) if the numbers (the price for the pills) are right but if it's going to be high like. I will even grab a thousand (1,000 Oxycodone pills) if you have them but ah, ah, so let me know."

90.   On February 24, 2013, at 12:59 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be HAGENAARS at Hagenaars Telephone #1. HAGENAARS told BOURQUE, "Hey man I got nothing going on." BOURQUE laughed and said, ". . . is that what Scott (believed to be a previous source of supply to BOURQUE) told you to tell me?" HAGENAARS said, "He didn't call me." BOURQUE replied, "You never mentioned that thing we talked about." HAGENAARS said, "No. No no no." BOURQUE then said, "Alright, listen. Can you get any of the blues (Percocets pills) right now?" HAGENAARS replied, "Uh, I have every feeler out there right now trying to get more . . . I have every feeler out there trying to increase that but I can't." HAGENAARS said he had nothing on hand, but might get something next week. Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE asked HAGENAARS if he was able to get a supply of Percocet/Oxycodone pills, which BOURQUE referred to as "the blues."

35

91.     On February 26, 2013, at 12:03 p.m, agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be Michael ROY at (508) 904-4222, subscribed to and believed to be used by Michael Roy (Roy Telephone #1). During the call, ROY said, "What's going on, man, things getting ugly." BOURQUE replied, "Yea its gross dude so what did you say you could get them for 24." ROY replied, "25 . . . I said 25, that why I am trying to wait . . . yea no I'm, this kid, he gets out of work, when he gets out of work if it doesn't go thru for you, I'm gonna just grab those." BOURQUE asked, "How many can he get?" ROY said, "I don't know, I can ask him, why you want to get some?" BOURQUE replied, " . . . I'm not gonna pay 25, but I will by a bunch of them if he comes down on the price." ROY said, "I will see how many the kid can get and I will call you back."

92.     Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE indicated to ROY that he was having a difficult time obtaining a supply of Oxycodone pills. ROY stated that he could get Oxycodone pills for $25 per pill, and BOURQUE indicated to ROY that he would be interested in purchasing a large quantity of pills if ROY's supplier came down on the price ("I'm not gonna pay 25, buy I will by a bunch of them if he comes down on the price").

93.     The same day, on February 26, 2013, at 5:41 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to ROY at Roy Telephone #1. ROY told BOURQUE, " . . . he doesn't have like fuckin' shit loads like, ya know what I mean. So I don't know if, if.... I got this other kid, though. How many you want, how many you gonna want?" BOURQUE replied, "I need a number Mike, price." ROY answered, "Well I paid 25 but

it's fuckin, it is what it is, you know what I mean. I only got 50 of them (referring to 50 Oxycodone pills) just to hold over . . . [b]ut, I mean the kid, this kid that I just went through, he only has like a hundred (Oxycodone pills) left so . . . ." BOURQUE said, "Ya, but I need to know the number, Mike. I'm not gonna buy 500 at 25. I'd just, I'd rather wait."

94.     The next day, on February 27, 2013, at 12:42 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#3) to a male believed to be ROY at Roy Telephone #1. At the beginning of the call, ROY asked, "Umm, did you make anything happen? Or?" BOURQUE replied, "I woulda' called you buddy, don't you think?" ROY then explained, "I mean it's just not the price that you wanna pay that's the problem." BOURQUE asked, "What's the number (the price)?" ROY said, "I picked em' up and I just been selling them, you know what I mean. I got it for 25 (dollars per pill). I'm sure I get a little cheaper, probably get em' for like, I don't know like this guy, this guy doesn't, this guy he deals with has got scripts (prescriptions) so he's got like another um like 150 (pills) left on this that side and there's another kid that has, I can get em' from, I can, I, I'd have to make like a few different people, you know what I mean, to get the numbers you want, but if you want me to get you something, I can get you something." BOURQUE told ROY, if you can do it, just give me the "number" (the price for the pills). Moments later, ROY said, "Alright, well I mean, I'm, I'm, I'm grabbin' em' in Framingham at like two thirty, another, more em' because these ones already went, so I'm gonna' be going down to Framingham at like... two thirty, three." BOURQUE interrupted, "Okay. What's the number Mike?" ROY said he could probably get them for

"24 (dollars per pill)", but BOURQUE said don't worry about it, and said he would wait

(for a better price).

95.     On February 27, 2013, at 8:11 a.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be EHWA at Ehwa Telephone #1. During

the call, BOURQUE asked EHWA, "Did you ever hear of the ALG 265 Perc. 30?"

EHWA asked, "265?" BOURQUE said, "Yah. It's a new one, it came out the ahhhhh,

this month. You could look online cause I might grab some of those today." EHWA said

he would look online and call BOURQUE back. At 8:31 a.m., BOURQUE called EHWA

again and told him, "Supposedly this afternoon around 2, but he said it might run later

than that because it's not a regular guy so he's gonna get a mixed bag of the regular ones,

but there's gonna be some of those eighty (80 mg Oxycodone pills) whatever's thrown in

there so.... You might want to start telling people now so they can read start reading up

on it because I don't wanna hear the moans later if it happens...[U/I]. He said there blue

ALG 265." EHWA said he had it right on his phone, and BOURQUE replied, "It came

up right, as a Perc 30 (Percocet 30 mg pills). BOURQUE said he would call EHWA back

later.

96.     On February 27, 2013, at 8:35 a.m., agents intercepted an incoming phone call to

BOURQUE (on TT#3) from a male believed to be ASSENCOA at Assencoa Telephone

#1. At the beginning of the call, BOURQUE told ASSENCOA, "I'm hoping today . . .

[b]ut it's not going to be till afternoon he said." ASSENCOA said, " . . . that's cool I ah I

saw that you called yesterday so I missed the call I didn't realize that." BOURQUE

continued, "No, that's alright. Listen, look up ah ALG two fifty... what is it two sixty

five? Cause I'm gonna be getting some of them, they're Perc 30's and they're gonna be mixed in but they're the same thing, but they're new so just Google them, they're on Pill Identifier, they're on the Internet so that way you could just start throwing it out there now so unless you don't (U/I) wanna pay anything cause people are gonna be like, you know what I mean. They're real. (U/I)." ASSENCOA asked, "What are they called?" BOURQUE replied, "ALG 265's . . . If you Google it they come up and they also come up on Pill Identifier as a Perc 30. They're the same things." At 12:16 p.m., BOURQUE received the following text message from ASSENCOA over TT#3, "Call me if u can I'm in fram and gotta go to Marlboro so didnt no if I should wait or go then c u later."

97.   At 2:41 p.m. on March 27, 2013, agents intercepted a phone call between BOURQUE (on TT#4) and a male believed to be KINNEY at Kinney Telephone #1. During the telephone call, BOURQUE and KINNEY agreed that "this whole situation" was frustrating. BOURQUE stated, "I'm payin' 23 and pickin' up eight and nine at a time. And the kid won't cut me a break. He's a fuckin' punk." BOURQUE then continued, "Well, I do have something lined up...the price is cheaper but the problem is...is that...I finally got in touch with him, like, six months ago...I haven't talked to him in three years...like two years, you know what I mean...'cause I keep gettin' new phones...so I finally reached out, got in touch [U/I]...."

98.   Based on my training and experience, as well as my participation in this investigation, I believe that during this phone call, BOURQUE and KINNEY were discussing the difficulty of acquiring Oxycodone while his source of supply was temporarily out of the country ("this whole situation"), and of paying an increased price of $23 per pill from

another source of supply ("I'm payin' 23 and pickin' up eight and nine at a time. And the kid won't cut me a break. He's a fuckin' punk."). BOURQUE continued, however, that he had contacted a previous source of supply who could potentially provide Oxycodone at a reduced cost ("the price is cheaper but the problem is...is that...I finally got in touch with him, like, six months ago...I haven't talked to him in three years...like two years, you know what I mean... 'cause I keep gettin' new phones...").

99.     At 4:28 p.m. on March 27, 2013, agents intercepted an incoming phone call to BOURQUE (on TT#4) from a male believed to be CHISHOLM at Chisholm Telephone #1. During the telephone call, CHISHOLM advised BOURQUE that an individual was on the way to CHISHOLM's house to give CHISHOLM money owed to BOURQUE, believed by law enforcement to be narcotics proceeds. CHISHOLM asked if BOURQUE could provide additional items (believed to be Oxycodone) tomorrow. BOURQUE complained about the source of supply's price of $24 per pill and the fact that the price was not being reduced despite BOURQUE's purchase of up to 800 pills at one time.

100.    At 6:41 p.m. on March 27, 2013, agents intercepted an outgoing phone call from BOURQUE (on TT#4) to a male believed to be ROY at Roy Telephone #1. During the phone call, ROY asked, "[C]an you leave them (Oxycodone) with Frank (MCGUIRE) or somethin' for me?" BOURQUE stated, "Yeah, I can," then asked, "What's the number (of pills)?" ROY responded, "50." BOURQUE stated, "Okay."

101.    At 5:50 p.m. on March 28, 2013, agents intercepted an incoming phone call to BOURQUE (TT#4) from a male believed to be CHISHOLM at Chisholm Telephone #1. During the phone call, CHISHOLM stated that he had BOURQUE's $1,800, believed by

law enforcement to be drug proceeds. BOURQUE stated that THOMAS EHWA was on his way to DEX-Corp with "those," believed to be Oxycodone pills. CHISHOLM informed BOURQUE that CHISHOLM had a new customer who wanted 100 a day, believed to be 100 Oxycodone pills per day. Video surveillance from the pole camera outside DEX-Corp captured EHWA arriving at DEX-Corp.

102.   At 11:34 a.m. on March 29, 2013, agents intercepted an outgoing phone call from BOURQUE (on TT#4) to a male believed to be CHISHOLM at Chisholm Telephone #1. During the phone call, CHISHOLM asked if he could get more of those "things," believed by law enforcement to be Oxycodone. BOURQUE responded that CHISHOLM could get the "things" if CHISHOLM had the money. Later in the conversation, BOURQUE asked if ███████ was going to give CHISHOLM $500 that day. CHISHOLM said, "Yes," but that ███████ owed "6," believed to be $600.

103.   At 5:03 p.m. on April 1, 2013, agents intercepted an incoming phone call to BOURQUE (on TT#4) from a male believed to be CHISHOLM at Chisholm Telephone #1. BOURQUE and CHISHOLM discussed acquiring "beans" (believed by law enforcement to be a reference to Oxycodone). CHISHOLM stated that he is waiting for calls from two individuals about "some sort of beans" (also believed to be a reference to Oxycodone). BOURQUE stated that he had been out of Oxycodone for several days and that his regular source of supply is expected back from the Dominican Republic in two weeks. CHISHOLM stated that he and BOURQUE needed an amount of Oxycodone for the next two weeks.

104.   At 1:47 p.m. on April 4, 2013, agents intercepted an incoming phone call to BOURQUE

41

(on TT#4) from a male believed to be ROY at Roy Telephone #1.  The phone call is

excerpted below:

| | |
|---|---|
| ROY: | I can...I can get...ah..the 40's...the OC 40's. |
| BOURQUE: | The OP? |
| ROY: | OC. |
| BOURQUE: | The real ones? |
| ROY: | Ya.  They're from Mexico...the OC 40's...the OC 40 EX's...the fucking...you can sniff...um...there good...everybody likes 'em. That's what I have been getting.  It's the only thing that's around. |
| BOURQUE: | Ya.  No blues? |
| ROY: | Ya.  A good price on 'em...you can get them for like 27 bucks if you buy a bunch.  Ya know, sell 'em for 40.  I sell 'em for 40.  You could sell 'em for like 30, 31. |
| BOURQUE: | Ya, but nobody knows...but who know those?  I have never even heard of them. |
| ROY: | That's...that's the only thing that's around bro.  Everybody's taking them.  Believe that, my phone has not stopped.. Dude...ya...everyone's saying there is nothing around.  I'm taking 'em..I'm taking 'em.  Corey called me...Corey got some yesterday off of me. |

          \*                 \*                \*

| | |
|---|---|
| ROY: | Yup.  Dude, it's the only thing that is around.  Dude, I'm telling you, people are gonna take 'em so if you want to do something, I got number...I can get numbers of that of that shit ya know. |
| BOURQUE: | Do they have 100 of them? |
| ROY: | Ya, I can get 100.  The same thing as before, you take off the coating and you use the shaver...you know what I mean? |
| BOURQUE: | Ohh, right. |
| ROY: | You know what I mean, same thing as the OC's, the regular [U/I]. |
| BOURQUE: | There from Mexico? |
| ROY: | Ya look them up online.  They're OC 40's. |

105.    Based on my training and experience, as well as my participation in this investigation, I

believe that in this phone call, ROY informed BOURQUE that ROY can get OC 40's, a

version of Oxycodone from Mexico ("They're from Mexico...the OC 40's...the OC

40's").[5]  BOURQUE asked whether ROY had a supply of Oxycodone manufactured in the US ("blues"), but ROY stated that there was no US-based Oxycodone available locally ("That's...that's the only thing that's around bro").  BOURQUE asked if ROY could get 100 pills of OC 40 pills for BOURQUE ("Do they have 100 of them?").  ROY stated he would get 100 for BOURQUE ("Ya, I can get 100").

106.  At 9:04 a.m. on April 5, 2013, agents intercepted a phone call  between BOURQUE (on TT#4) and a male believed to be ROY at Roy Telephone #1.  During the phone call, ROY stated, "I got better news.  I can get those blues."  BOURQUE asked, "How much?"  ROY responded, "Cheap. $22.50, $22.50 for you."  BOURQUE asked, "How many can you get?"  ROY replied, "As many as this guy...this lady has 3000...Dominican lady."  BOURQUE asked, "Do you meet her yourself?"  ROY stated, "My Dominican guy, right, my Dominican guy, it's his, it's his...this is...this is on point...we'll...we're gonna be able to meet...boom, boom, bang, bam, bang, boom...like that."  At the end of the conversation, BOURQUE stated, "I will blow off the gym.  Call me back."  ROY stated, "All right.  Bye."

107.  Based on my training and experience, as well as my participation in this investigation, I believe that in this phone call, ROY informed BOURQUE that ROY had found a source of Oxycodone supply ("I can get those blues").  BOURQUE inquired about price ("How much?").  ROY answered that the pills would be $22.50 per pill ("Cheap. $22.50, $22.50 for you.").  BOURQUE asked how many pills were available ("How many can you

---

[5]  An Internet search of online drug database "www.drugs.com" indicates that OC 40 is OxyContin (generic name Oxycodone) in 40 mg strength.

get?"). ROY stated the source of supply, a woman of Dominican descent, had 3000 pills. BOURQUE asked ROY to call him back about the possible alternate source of narcotics supply.

108.   At 3:03 p.m. on April 7, 2013, agents intercepted a phone call between BOURQUE (on TT#4) and a male believed to be CHISHOLM at Chisholm Telephone #1. During the telephone call, BOURQUE stated, "I did meet somebody else (an alternate source of Oxycodone supply) today...." CHISHOLM asked, "You grabbed one?" BOURQUE replied, "A 'hundo' (100 pills)." CHISHOLM then asked, "How much was that? Ridiculous?" BOURQUE responded, "No. It's twenty-three (dollars per pill) to me, which isn't too bad but.... Well, hopefully, he said they can come down in price but we'll see. He's gonna call me. I gave him my number." Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE and CHISHOLM were discussing an alternate source of Oxycodone while BOURQUE's primary source was out of the country.

109.   At 2:40 p.m. on April 10, 2013, agents intercepted an outgoing phone call from BOURQUE (on TT#4) to a male believed to be ROY at Roy Telephone #1. During the phone call, BOURQUE and ROY discussed the recent increase in price for Oxycodone. BOURQUE stated, "Obviously, you know, crazy expensive, but, ah, I can probably, if he can gives it to me for 24, like, I'll do you 25...." BOURQUE continued, "I'm not telling everyone, but my [guy] is supposed to back Sunday...he said it's gonna be a few days before he can do something...." Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE offered Oxycodone to ROY

for $25 per pill if BOURQUE's alternate source of supply provided the pills to

BOURQUE for $24 per pill. BOURQUE also indicated he believed that his primary

source of Oxycodone supply would return on Sunday, and that BOURQUE would resume

narcotics dealing with the source of supply in a few days of the supplier's return.

 2. *BOURQUE Obtains 700 Oxycodone Pills from HAGENAARS's Source of Supply*

110. As further described below, during a series of calls between February 25, 2013 and

February 28, 2013, BOURQUE arranged to get approximately 700 Oxycodone pills from

HAGENAARS' unidentified source of supply. On February 28, 2013, agents set up

surveillance in Brighton, Massachusetts, and observed BOURQUE, MCGUIRE, and

HAGENAARS meet with an unidentified Hispanic male who agents believe delivered

400 Oxycodone pills:

111. On February 25, 2013, at 11:19 a.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to a male believed to be HAGENAARS at Hagenaars Telephone

#1. During the call, agents believe that BOURQUE asked HAGENAARS about

obtaining a supply of Oxycodone from HAGENAARS' unidentified source of supply.

BOURQUE told HAGENAARS, "Well, how would it work would? You get them first

or would I have to give you the money first?" HAGENAARS replied, "You can fuckin

come with me dude I don't care. I don't care how we do it . . . I don't care how we do it.

You can pick me up and drive me there, I don't care." HAGENAARS said he was not

going to run off with BOURQUE's money. BOURQUE explained, ". . . I don't do that

with anyone, not just you or anyone else . . . It's just not good business."

112. On February 26, 2013, at 8:06 a.m., agents intercepted an text message to BOURQUE (on

TT#3) from a male believed to be PANAGGIO at Panaggio Telephone #1. PANAGGIO wrote, "How's it looking?" At 8:07 a.m., BOURQUE replied, "Won['']t know til 11." Based on my training and experience, as well as my participation in this investigation, I believe that PANAGGIO asked BOURQUE about the status of a possible supply of Oxycodone that BOURQUE was arranging to get from HAGENAARS and his source.

113.     On February 26, 2013, at 11:31 a.m., agents intercepted an incoming phone call to BOURQUE (on TT#3) from a male believed to be HAGENAARS at Hagenaars Telephone #1. At the beginning of the call, BOURQUE, "Your guy ever come through?" HAGENAARS replied, "I thought you said you were all gonna be all set today." BOURQUE said, "Ah, I'm waiting. I haven't, I talked to him this morning. He, I thought he was gonna be all set too." HAGENAARS said, "Alright. I didn't even call him 'cause I was waiting. Going through you." BOURQUE said, "Well, you should call him." HAGENAARS said, "Alright, let me call him. Okay, let me call him." In this call, agents believe that BOURQUE asked HAGENAARS to contact his source of supply to arrange to get Oxycodone pills.

114.     On February 27, 2013, at 12:57 p.m., agents intercepted an text message to BOURQUE (on TT#3) from a male believed to be PANAGGIO at Panaggio Telephone #1. PANAGGIO wrote, "How['']s it looking?" At 1:07 p.m., BOURQUE responded, "Call u when i know hoping today." Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE informed PANAGGIO that he was hoping to get a supply of Oxycodone the same day.

115.     On February 28, 2013, at 8:33 a.m., agents intercepted an outgoing phone call from

BOURQUE (on TT#3) to male believed to be HAGENAARS at Hagenaars Telephone

#1. At the beginning of the call, HAGENAARS asked, "Are you all set today or no?"

BOURQUE replied, "Ah..I haven't talked to him yet he, he doesn't, he doesn't usually

get up till 9 o-clock. Um...I'm supposed to be, but if I'm not, does your guy got anything .

. . ." HAGENAARS interrupted, "...I was trying to get a hold of you last night, cause ah,

he was asking me, 'cause he was all set whatever he wanted to go back to [U/I] and grab

another like 700 (referring to 700 Oxycodone pills) last night in case you needed

something, but you never got back to me so I couldn't tell him to do it. But, I know he

said he could do it right away so." BOURQUE answered, "But, what, what would the

number (the price) be on 700." HAGENAARS replied, "Ah..I don't know I got to talk to

him." BOURQUE then said, "Well if my guy doesn't come through today I'll do

something with ya. But I....can't pay 25 ($25 per pill) 'cause there's no way I'd be able to

make any money." BOURQUE and HAAGENAARS agreed to talk later.

116.    A short time later, at 8:55 a.m., agents intercepted a text message to BOURQUE (on

TT#3) from a male believed to be HAGENAARS at Hagenaars Telephone #1.

HAGENAARS wrote, "He has 4left 22.5." At 8:56 a.m., BOURQUE received another

text message from HAAGENAARS that read, "Sorry 23 me make .50 cents." At 9:46

p.m., BOURQUE made an outgoing call over TT#3 to HAGENAARS. BOURQUE said

he was just reading HAGENAARS' text message. HAGENAARS said, "Oh, I was

saying that he had like 400 left, I was just letting you know he had 400 left . . . The best I

can do is 23." BOURQUE replied, "Um...Alright I'll grab them, when?"

HAGENAARS, said, "Aahh, when ever you want, I talked to him and he said he's ready

to go." Agents believe that HAGENAARS told BOURQUE that HAGENAARS' source had about 400 Oxycodone pills left, and that the source indicated he would sell at $23 per pill.

117.  In an intercepted call at 9:58 a.m., HAGENAARS then asked BOURQUE if he could come to his location before noon. During a call at 10:58 a.m., BOURQUE asked HAGENAARS if he could give the money directly to his source. Agents believe that BOURQUE wanted to meet HAGENAARS' source directly in order to "cut out" HAGENAARS, the broker/middleman in the deal, and go directly to HAGENAARS' source to obtain Oxycodone pills. BOURQUE said he was nervous because it was a "ton of money," which in a call at 1:03 p.m., BOURQUE said was $9,200 (400 pills at a price of $23 per pill). HAGENAARS replied, "I don't know if he'll do that, I'll ask him, I, I got no problem with it dude, all I'm gonna do is take your money and, and put my money in with it and I'm handing it to him." During a call at 12:48 p.m., HAGENAARS told BOURQUE to meet him at the Stockyard Restaurant in Brighton.

118.  On February 28, 2013, at 12:54 p.m., BOURQUE made an outgoing call over TT#3 to a male believed to be PANAGGIO at Panaggio Telephone #1. During the call, agents believe that BOURQUE informed PANAGGIO that he was picking a supply of Oxycodone pills, and could resell a portion of the pills at a price of $26 per pill. At the beginning of the call, BOURQUE asked, "Are you still dry? . . . Or you been going to see Tommy for thirty bucks? And getting fucking croaked?" PANAGGIO replied, "No, I haven't seen him for a little bit . . . [VOICES OVERLAP]. BOURQUE continued, "Ya, well listen I'm going to grab something right now but they're gonna be [STUTTERS] it's

48

just temporary 'cause I can't wait anymore but I mean I'm not gonna [VOICES

OVERLAP] I mean I'm not gonna pork you to bad I can do 26 on them."

119.    During an intercepted call at 1:25 p.m., HAGENAARS explained to BOURQUE how

they were going to meet HAGENAARS' source.  HAGENAARS said, "He's gonna pull

up, I'm gonna jump in, him, and get right back in the car, he's just gonna park right next

to us. He's literally gonna park right next to us. I'm gonna get out, get in his car, get back

in your car, or my car, or what ever you wanna do."  BOURQUE asked, "How are they

wrapped? Are they counted all in ones? Or are they . . . ."  HAGENAARS explained that

he would put 400 altogether.  BOURQUE said he was worried about giving almost ten

thousand dollars to someone he didn't know, and getting shorted.  HAGENAARS said, ".

. . he's never been off with me once . . ."

120.    Around the same time, agents set up surveillance in the area of the Stockyard Restaurant

located at 135 Market Street in the area of Brighton, Massachusetts in anticipation of a

meeting and drug transaction between BOURQUE, HAGENAARS, and an unknown

third party. At 1:38 p.m., DEA TFO Joseph Connors observed a green Toyota Rav4

bearing MA registration 664-FH1 enter the Stockyard Restaurant parking lot. At that

time, TFO Connors observed that the operator and sole occupant of the vehicle was

HAGENAARS. About a minute later, at 1:39 p.m., TFO Connors observed a black

BMW, bearing MA registration 993SX8 pull into the same parking lot. Agents have

frequently observed BOURQUE operating this same vehicle, which is registered to

BOURQUE. TFO Connors observed the operator to be BOURQUE and the passenger to

be MCGUIRE. TFO Connors observed BOURQUE's BMW slowly drive through the

49

parking lot and the Toyota Rav4, follow closely behind. Both vehicles traveled through the lot and onto Vineland Street.

121.   A short time later, DEA SA Michael O'Shaughnessy observed HAGENAARS' Toyota Rav4 pull over on Vineland Street and park. Special Agent O'Shaughnessy observed HAGENAARS get out of Toyota Rav-4 and get into the rear seat of BOURQUE's BMW. Agent O'Shaughnessy then observed the BMW pull onto Market street and drive south.

122.   At 1:43 p.m., SA O'Shaughnessy saw BOURQUE's BMW (now believed to be occupied by BOURQUE, MCGUIRE, and HAGENAARS) pull into a Dunkin' Donuts, located at the corner of Market and North Beacon Streets in Boston. Agent O'Shaughnessy observed HAGENAARS get out of the BMW and enter the Dunkin' Donuts. About 10 minutes later, at 1:55 p.m., TFO Connors observed HAGENAARS exit the Dunkin' Donuts and get back into the back seat of the BMW. TFO Connors observed the BMW remain in the Dunkin' Donuts parking lot for about 5 minutes.

123.   At around 2:00 p.m.,TFO Connors observed BOURQUE's BMW exit the Dunkin' Donuts parking lot and travel South on Market Street. At 2:02 p.m., SA O'Shaughnessy observed BOURQUE's BMW turn onto Fanueil Street in Brighton and stop in the area of the Fanueil Street Housing Projects. At that time, SA O'Shaughnessy saw the black BMW pull over and pick up an unidentified Hispanic male. The unidentified male got into the rear seat of the BMW and SA O'Shaughnessy observed it to travel west on Fanueil Street. Agent O'Shaughnessy followed the BMW as it drove around the block until it turned back onto North Beacon Street in Brighton. At 2:08 p.m., SA O'Shaughnessy observed the BMW pull into the gas station located at the corner of

50

Market and North Beacon Streets in Boston. At this location, SA O'Shaughnessy observed the unidentified Hispanic male exit BOURQUE's BMW, and walk towards the Fanueil Street Housing Project.

124.    On February 28, 2013, at 2:17 p.m., BOURQUE made an outgoing call over TT#3 to a male believed to be CHISHOLM at Chisholm Telephone #1. During the call, BOURQUE told CHISHOLM that he "grabbed something just now right, but . . . Numbers, numbers out of control" at a price of 26. BOURQUE stated that he was still waiting for his regular guy. In this call, agents believe that BOURQUE informed CHISHOLM that he obtained a supply of Oxycodone pills that he would sell at a price of $26 per pill.

**D.    Mark OUELLETTE and Sean COTTER Distribute 700 Oxycodone Pills to BOURQUE and Seizure of Oxycodone and Firearm from OUELLETTE**

125.    As further described below, beginning on March 29, 2013, agents intercepted a series of calls between BOURQUE and a male identified as Sean COTTER. During these calls, BOURQUE arranged to obtain 700 Oxycodone pills from COTTER's source of supply, who was later identified as Mark OUELLETTE. Following the transaction, agents conducted a consent search of OUELLETTE's residence in Shirley, Massachusetts and seized between 1,500 to 2,000 pills of suspected Oxycodone, over $30,000 in cash, and a loaded firearm.

126.    At 2:30 p.m. on March 29, 2013, agents intercepted an outgoing phone call from BOURQUE (on TT#4) to a male believed to be Sean COTTER at (781) 315-1111, subscribed to and believed to be used by COTTER (Cotter Telephone #1). During the

phone call, BOURQUE stated, "All right, just tell me where you want me to meet ya."

COTTER stated, "You know where we'll meet?  Right at the Dunkin' Donuts."

127.   Approximately 12 minutes later, at 2:42 p..m., agents intercepted another phone call

between BOURQUE and COTTER.  During the phone call, BOURQUE asked, "Did I

tell you the number?"  COTTER replied, "[Y]ou didn't tell me your number, no."

BOURQUE said, "Okay...seven."  COTTER confirmed, "You want seven.  Okay."

Based on my training and experience, as well as my participation in this investigation, I

believe that COTTER confirmed BOURQUE's request to buy 700 Oxycodone pills

("You want seven.  Okay.").

128.   At 3:12 p.m., agents intercepted a third phone call  between BOURQUE and COTTER.

COTTER asked, "Hey, you want coffee?"  BOURQUE asked, "You're already there?"

COTTER responded, "Yeah."  BOURQUE stated, "I'm outside.  A large, hot coffee with

one milk with a couple of ice cubes."  At 3:14 p.m., GPS data from the Court-authorized

tracking device affixed to BOURQUE's 2012 BMW indicated that BOURQUE's BMW

was in the vicinity of Dunkin' Donuts, located at 299 Main Street, Acton, MA.

129.   Shortly after the intercepted telephone call at 3:12 p.m., surveillance officers observed

BOURQUE's BMW (with driver BOURQUE and passenger MCGUIRE) arrive at the

Dunkin' Donuts, and observed COTTER enter BOURQUE's BMW.  Surveillance

officers followed BOURQUE's BMW from the Dunkin' Donuts in Acton to a Dunkin'

Donuts in Shirley, MA.  In the Shirley parking lot of Dunkin' Donuts, surveillance

officers observed COTTER exit BOURQUE's BMW and lean into an open door of a

black Jeep Cherokee, also located in the Shirley parking lot.  COTTER interacted with

the driver of the Jeep Cherokee for approximately one minute, then returned to BOURQUE's BMW. Both BOURQUE's BMW and the Jeep Cherokee departed. Law enforcement followed the Jeep Cherokee to 6 Lancaster Road, Shirley, Massachusetts, the residence of Mark OUELLETTE, and observed the driver exit the Jeep Cherokee and enter the house.

130.   Law enforcement identified the driver of the Jeep through RMV records as Mark OUELLETTE, and approached OUELLETTE in his driveway when he exited the residence a short time later. Agents spoke with OUELLETTE, and he consented to a search of his home, which revealed approximately 1,500 to 2,000 pills of suspected Oxycodone, over $30,000 in U.S. Currency and a loaded firearm.[6]

131.   Following the consent search at OUELLETTE's residence, agents intercepted several calls between BOURQUE and COTTER about the incident. At 4:56 p.m., agents intercepted a fourth phone call between BOURQUE and COTTER. The phone call is excerpted below:

| | |
|---|---|
| BOURQUE: | Yo. |
| COTTER: | Hey, get rid of that shit. |
| BOURQUE: | What? |
| COTTER: | Get rid of that shit. He just got raided. |
| BOURQUE: | For real? |
| COTTER: | I not lying, dude. I just got called by a couple people saying, "Don't come up here." |
| BOURQUE: | What? |
| COTTER: | I'm not lying. So I don't know what's going on. Task force is in |



<blockquote>
his house right [U/I].<br>
BOURQUE:   Yeah, but they wouldn't [stutters], I mean they would have grabbed us already.<br>
COTTER:    Listen, I'm just telling ya.<br>
BOURQUE:   Okay.<br>
COTTER:    Hide it.  Do something, you know?<br>
BOURQUE:   Alright.
</blockquote>

132.    Based on my training and experience, as well as my participation in this investigation, I believe that in this phone call, COTTER advised BOURQUE to dispose of the Oxycodone BOURQUE purchased from OUELLETTE through COTTER ("Hey, get rid of that shit."). COTTER explained that law enforcement had entered OUELLETTE's house ("He just got raided...[t]ask force is in his house."). Also, BOURQUE considered whether he and COTTER should themselves be concerned about law enforcement ("Yeah, but they wouldn't [stutters], I mean they would have grabbed us already"). COTTER urged BOURQUE to either conceal the Oxycodone, or dispose of it ("Hide it. Do something, you know?").

133.    At 5:09 p.m., agents intercepted another call between BOURQUE and COTTER.  During the phone call, BOURQUE asked, "[W]hat did this kid know about me and you and I know he knows you very well but what does he know about me?" COTTER responded, "Nothing." BOURQUE stated, "Be honest, dude. I know...please...I mean everyone's safety...." COTTER replied, "I'm telling you right now – nothing." BOURQUE asked, "He doesn't even know where I'm from or nothing?" COTTER answered, "Nope." BOURQUE asked again, "He doesn't know my name?" COTTER again replied, "Nope." BOURQUE then said, "Okay."

134.    Based on my training and experience, as well as my participation in this investigation, I

believe that in this phone call, BOURQUE was trying to determine what information OUELLETTE had, and might disclose to the police about BOURQUE ("[W]hat did this kid know about me and you and I know he knows you very well but what does he know about me?"). BOURQUE asked COTTER several times, and COTTER assured BOURQUE that OUELLETTE did not know BOURQUE's name or location ("I'm telling you right now – nothing").

135.   At 6:06 p.m., agents intercepted another phone call to BOURQUE (on TT#4) from a male believed to be CHISHOLM at Chisholm Telephone #1. BOURQUE stated that he and MCGUIRE went to grab some (believed by law enforcement to be a reference to narcotics) from a guy named "Mark" (believed to be OUELLETTE), and 20 minutes later, "Mark" got raided. BOURQUE continued that the "connect" (believed to be a reference to OUELLETTE as a source of Oxycodone supply for BOURQUE) was gone. However, BOURQUE commented that it was fortunate that BOURQUE got 800 (believed to be the approximate quantity of Oxycodone pills BOURQUE purchased from OUELLETTE).

136.   At 1:25 p.m. on April 1, 2013, agents intercepted an outgoing phone call from BOURQUE (on TT#4) to a male believed to be KINNEY at Kinney Telephone #1. BOURQUE informed KINNEY that an individual was arrested (believed by law enforcement to be a reference to OUELLETTE), but BOURQUE was not concerned because the individual did not know BOURQUE's name.

137.   At 12:31 p.m. on April 9, 2013, agents intercepted an incoming phone call to BOURQUE (on TT#4) from a male believed to be COTTER at Cotter Telephone #1.

During the phone call, COTTER stated, "I just talked to Mark (OUELLETTE) for about 45 minutes." COTTER indicated, "[I]t doesn't look good in his (OUELLETTE's) eyes.... [H]e was arrested and we were the only people not arrested." COTTER continued, "[T]hey took everything and they want him to dime the bigger guy." BOURQUE stated, "[I]t will all come out in the paperwork, dude." BOURQUE continued, "I'm not worried about it 'cause my name's gonna be nowhere on it, Frank (MCGUIRE)'s name gonna be nowhere on it, and your name." Based on my training and experience, as well as my participation in this investigation, I believe that COTTER and BOURQUE were discussing the arrest of Mark OUELLETTE on March 29, 2013, shortly after BOURQUE, with MCGUIRE and COTTER, had purchased approximately 700 Oxycodone pills from OUELLETTE. COTTER indicated that OUELLETTE believed BOURQUE, MCGUIRE, and COTTER had informed law enforcement of OUELLETTE's narcotics dealing in return for BOURQUE, MCGUIRE, and COTTER not being charged with narcotics offenses ("[I]t doesn't look good in his eyes.... [H]e was arrested and we were the only people not arrested."). BOURQUE was confident that eventually, court documents ("paperwork") would reflect that BOURQUE, MCGUIRE, and COTTER had no part in causing OUELLETTE's arrest ("I'm not worried about it 'cause my name's gonna be nowhere on it, Frank's gonna be nowhere on it, and your name").

### E.   BOURQUE Obtains Oxycodone from Mark NEWTON

138.   The investigation revealed that Mark NEWTON was one of BOURQUE's regular wholesale customers/re-distributors of Oxycodone. As further described below, during a an intercepted call on February 1, 2013, NEWTON asked BOURQUE about

BOURQUE's supply of Oxycodone.

139.   On February 1, 2013, at 4:53 p.m., agents intercepted an incoming phone call to

BOURQUE (on TT#1) from a male believed to be Mark NEWTON at (774) 292-0888,

subscribed to and believed to be used by NEWTON (Newton Telephone #1).  During the

phone call, NEWTON asked, "What are you doing, guy?"  BOURQUE replied,

"Working."  NEWTON asked, "You have gumdrops?"  BOURQUE responded, "Yup."

NEWTON stated, "Alright, cool.  I'll ah, I'll be over in a little bit."

140.   Based on my training and experience, as well as my participation in this investigation, I

believe that NEWTON asked BOURQUE whether BOURQUE was selling Percocet

("You have gumdrops?").  BOURQUE replied that he did ("Yup").  NEWTON stated

that he would soon go to BOURQUE's location to purchase the pills ("Alright, cool.  I'll

ah, I'll be over in a little bit.").

141.   Later in the investigation, on April 12, 2013, BOURQUE obtained a quantity of

Oxycodone from NEWTON's source of supply for Oxycodone, ██████████ Following

the transaction, law enforcement officer conducted a traffic stop of ██████ and found

him to be in the possession of approximately $7,000 in cash.

142.   On April 12, 2013, agents intercepted several phone calls between BOURQUE (on TT#4)

and a male believed to be NEWTON at Newton Telephone # 1.  At 5:08 p.m., NEWTON

stated, "Okay and ummm...I'll let you know...I'll let you know how many 'cause he

(source of Oxycodone supply) might be short on the 5 (hundred pills), but he's grabbing

another ka'billion in the morning."  At 5:53 p.m., NEWTON stated, "[A]ll he has left

now is 349, but he's re-upping in the morning."  At 6:12 p.m., NEWTON stated, "You

can go and grab the dough for...ummm...338 (pills)." BOURQUE asked, "You on your way?" NEWTON responded, "Yup, I'm leaving right now the north side." At 6:24 p.m., BOURQUE asked, "Are you there?" NEWTON replied, "I just didn't want to be waiting outside. I'm pulling in, in two seconds." BOURQUE stated, "I'll be there in like three minutes." Less than one minute later, BOURQUE (on TT#4) called MCGUIRE (at 781-530-0878) and stated, "He's pulling in. You wanna let him in 'cause he doesn't want to be sitting outside." Based on my training and experience, as well as my participation in this investigation, I believe that in this series of phone calls, BOURQUE arranged to purchase 338 Oxycodone pills from a source of supply through NEWTON as an intermediary.

143.    At 9:53 a.m. on April 13, 2013, agents intercepted an outgoing phone call from BOURQUE (on TT#4) to a male believed to be CHISHOLM at Chisholm Telephone #1. During the phone call, BOURQUE and CHISHOLM discussed BOURQUE's purchase of Oxycodone pills (from NEWTON and NEWTON's source of supply) the day before. CHISHOLM informed BOURQUE that CHISHOLM had an individual who wanted to purchase 50 to 100 pills. BOURQUE stated that he should be able to do something for CHISHOLM in the afternoon. During the call with CHISHOLM, BOURQUE answered call-waiting to speak with (508) 904-4222, believed to be used by ROY. ROY asked whether the prices were any lower. BOURQUE stated that BOURQUE is paying $25 for each (Oxycodone) pill.

144.    On April 13, 2013, agents intercepted several phone calls between BOURQUE (on TT#4) and a male believed to be NEWTON at Newton Telephone #1. At 10:08 a.m., NEWTON

called BOURQUE and the two discussed BOURQUE obtaining "two" (200 Oxycodone pills). At 2:16 p.m., NEWTON called BOURQUE and stated that he was going to meet with his associate, believed by law enforcement to be the source of supply who provided pills to NEWTON for BOURQUE on the previous day. BOURQUE told NEWTON to "definitely do it" and stated BOURQUE would call NEWTON when BOURQUE was on his way back to the shop.

145.   At 3:40 p.m., NEWTON called BOURQUE, who stated that he (BOURQUE) would be at the shop to meet NEWTON in ten minutes. Shortly thereafter, surveillance officers observed NEWTON arrive at DEX-Corp. Surveillance officers then, at 4:17 p.m., observed NEWTON depart DEX-Corp. Three minutes later, surveillance officers observed NEWTON in Framingham where NEWTON met with ███████ an individual known through his prior interaction with law enforcement related to narcotics. NEWTON and ██████ met at which time NEWTON handed what appeared to be cash to ███████ who placed the cash in his left jacket pocket. After NEWTON and ███████ separated, surveillance officers observed NEWTON place an item into his groin area.

146.   In coordination with this investigation, Framingham Police detectives performed a traffic stop on ██████ vehicle as ██████ was known to law enforcement to have a suspended driver's license. ██████ was arrested for the traffic violation, and during an inventory of ██████ possessions, a roll of $4400 cash[7] was recovered from ██████ left jacket pocket. Additional rolls of U.S. currency were recovered from the same left jacket

---

[7]  $4400 cash would correspond to a purchase price of $22 per pill for the 200 Oxycodone pills requested by BOURQUE.

pocket, with other U.S. currency found in ▮▮▮▮ pant pocket. The total amount of currency recovered from ▮▮▮▮ was $7,671.

147.   On April 14, 2013, agents intercepted several phone call between BOURQUE (on TT#4) and a male believed to be NEWTON at Newton Telephone #1. At 10:52 a.m., BOURQUE asked NEWTON if NEWTON has left yet. BOURQUE told NEWTON to just bring five (hundred Oxycodone pills). At 11:03 a.m., BOURQUE asked if NEWTON was "here." NEWTON answered, "Yes." BOURQUE told NEWTON to park in front, activate his hazard lights, and come to the second floor. At 11:05 a.m., NEWTON stated that he had arrived. BOURQUE asked NEWTON to meet him at apartment number 22.

148.   At 1:53 p.m. on April 4, 2013, agents intercepted an incoming phone call to BOURQUE (on TT#5) from a male believed to be PANAGGIO at Panaggio Telephone #1. The phone call is excerpted below:

> BOURQUE:   The guy you go thru...cousin [U/I].
> PANAGGIO: Um...I can give him a buzz.
> BOURQUE:   Even if it's 100.
> PANAGGIO: Yesterday, the kid had 63 left. I'm sure those are gone, but I can
>                    give a shout.
> BOURQUE:   Alright. You...OC 40's from Mexico.
> PANAGGIO: Huh?
> BOURQUE:   OC 40 from Mexico.
> PANAGGIO: Have I ever heard of them?
> BOURQUE:   Ya.
> PANAGGIO: No.
> BOURQUE:   You know what OC 40's are, right?
> PANAGGIO: Ya, I know what they are. I have never done 'em.
> BOURQUE:   [U/I].
> PANAGGIO: Alrighty.
> BOURQUE:   Bye.

149.   Based on my training and experience, as well as my participation in this investigation, I

believe that in this phone call, BOURQUE asked PANAGGIO to contact PANAGGIO's

cousin as a possible source of Oxycodone supply ("The guy you go thru...cousin [U/I]").

PANAGGIO agreed ("I can give him a buzz").  BOURQUE indicated that even if the

amount was only 100 pills, BOURQUE would be interested in purchasing the narcotics

("Even if it's 100").  BOURQUE then asked PANAGGIO about Mexican Oxycodone,

OC 40's ("OC 40's from Mexico").  PANAGGIO stated that he knew what OC 40's

were, but he had never tried them ("I have never done 'em").

150.   On April 18, 2013, between 10:14 a.m. and 5:13 p.m., agents intercepted a series of text

messages between BOURQUE (on TT#5) and a male believed to be NEWTON at

Newton Telephone #1.  The text messages are excerpted below:

> NEWTON:      All good after work
> BOURQUE:   Nice take maybe 1200
> NEWTON:      Ill c what i can do for ya
> BOURQUE:   K call 1st
> NEWTON:      Ok
> NEWTON:      12 works
> BOURQUE:   K call 1st want to make sure and number can he come down
> NEWTON:      Ive been tryin. I dont think so tho
> BOURQUE:   Do 8
> NEWTON:      You dick. Ok
> BOURQUE:   Dont want to b short
> NEWTON:      I got u. I just dont like changing it up on him a bunch of times
> BOURQUE:   Call me when u lea[v]e going to house
> NEWTON:      K

151.   Based on my training and experience, as well as my participation in this investigation, I

believe that BOURQUE again arranged to purchase an amount of Oxycodone pills from

narcotics supplier ▇▇▇▇▇▇ through NEWTON; initially, BOURQUE requested 1200 pills

("take maybe 1200"), but subsequently decided on 800 pills ("Do 8"). BOURQUE asked

NEWTON to call BOURQUE when NEWTON left to meet with BOURQUE for the

narcotics transaction.

152.     At 2:06 p.m. on April 21, 2013, agents intercepted an outgoing phone call from

BOURQUE (on TT#5) to a male believed to be NEWTON at Newton Telephone #1.

BOURQUE stated, "Listen. Just grab them and tell them the kid's gonna be out until like

6 or 7 (p.m.) with his girl[friend]. Maybe 7:30. I'll be home by, like 7:30, and then you

can just swing by. So, it's a definite, a done deal for five." NEWTON stated, "So, I'm

gonna, I'm gonna do what I can and you call me when you're done with the girl."

BOURQUE responded, "Yeah. So, just grab them like I say. It's a 100%. So

[whispering], my phone might be off all day, but [as] soon I get back, I'll call you.

Whatever time it is and just...you know what [I] mean?" NEWTON agreed,

"Yeah...[t]hat's fine...[n]o problem, buddy."

153.     Based on my training and experience, as well as my participation in this investigation, I

believe that NEWTON, again serving as an intermediary, facilitated a narcotics

transaction for 500 Oxycodone pills between BOURQUE and source of supply██████████.

As BOURQUE's primary source of supply continued to be out of the country,

BOURQUE turned to ████████ as an alternative supplier of Oxycodone through

NEWTON.

## V. THE TARGET LOCATIONS

### Target Location #1

154. 197 West Central, Natick, Massachusetts is the physical location of BOURQUE's shipping business, DEX Corporation (DEX-Corp). The business is housed in the northeast corner of the building which is also occupied by Master Chimney Sweeps on the west side, and the OB Hill Trucking & Rigging Company on the south side (there are also smaller offices located on the west side). The complex is located off of West Central Street behind a separate building which houses the Asia Bistro Restaurant. Target Location #1 is a two-story steel-framed rectangular structure with an exposed concrete foundation and brown aluminum facade surrounding the building with a concrete foundation which extends up to the facade. There are three entry points to DEX-Corp. The main entrance is an exterior steel door on the east side of the building near the northeast corner. The door is brown, marked "DEX CORP" in yellow paint. There is a rectangular portal window and the door opens outward to the right. There are two loading docks with overhead opening doors located to the left of the main door. Only the loading dock on the right side services DEX Corporation. The last entry point is from inside the building which allows access from DEX Corporation to a corridor where bathrooms are located. There is no direct access to the corridor from the exterior of the building.

155. Based on physical surveillance; intercepted telephone calls and text messages to and from TT#1, TT#2, TT#3, TT#4, and TT#5; GPS location data from the Court-authorized tracking device affixed to BOURQUE's vehicle; and regular monitoring of a pole camera

installed in the immediate vicinity of Massachusetts, agents have determined that Frank

MCGUIRE currently resides at Target Location #1.

156. Since at least May 2012, members of the DEA, with law enforcement agents from

Waltham, Newton, Arlington, Framingham, and Massachusetts State Police, have

conducted both physical and video surveillance at Target Location #1. During this

surveillance, agents have regularly observed BOURQUE and several other Target

Subjects, who, as detailed above, are believed to be both drug customers of BOURQUE

and drug runners/couriers for BOURQUE. Agents have often seen a significant number

of vehicles, often five or six an hour, come and go from Target Location #1. Often times,

the occupants of these vehicles entered the business for about 60 to 90 seconds, then

departed the business and drove away. Based on my training and experience, and prior

surveillance in numerous drug investigation, the kind of vehicle and foot traffic agents

have observed coming in and out of Target Location #1 is consistent with sales of illegal

drugs and appear to be unrelated to any legitimate shipping business of DEX-Corp.

157. As previously described above, Target Location #1 has been linked to criminal activity:

For example, on April 13, 2013, BOURQUE purchased 200 Oxycodone through

NEWTON. BOURQUE asked NEWTON to get 200 Oxycodone pills from a source of

supply. At 3:40 p.m., NEWTON called BOURQUE, who stated that he (BOURQUE)

would be at the shop to meet NEWTON in ten minutes. Shortly thereafter, surveillance

officers observed NEWTON arrive at DEX-Corp. Surveillance officers then, at 4:17

p.m., observed NEWTON depart DEX-Corp. Three minutes later, surveillance officers

observed NEWTON in Framingham where NEWTON met with ███████, the source

of supply. NEWTON and ████████met at which time NEWTON handed what appeared to be cash to ████████ who placed the cash in his left jacket pocket. After NEWTON and ████████ separated, surveillance officers observed NEWTON place an item into his groin area. Based on my training and experience, as well as my participation in this investigation, I believed that BOURQUE provided purchase money to NEWTON at DEX-Corp, after which NEWTON acquired the requested Oxycodone from ████████

158.   Additionally, on April 16, 2013, at 1:13 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#5) to PANAGGIO at Panaggio Telephone #1. During the call, BOURQUE stated, "Listen...I bought a safe last night. BOURQUE continued, "For the stuff (narcotics)...a little small safe. So, they must of took my key when I went to the bathroom this morning because there was a bunch of people in the office and they ust of opened it up real quick. I'm not even kidding ya. This is what I deal with in my life." Based on my training and experience, as well as my participation, I believe that BOURQUE secures narcotics and other related important items in a safe located at DEX-Corp.

159.   Based on my training and experience, as well as my participation in this investigation, I believe that (a) BOURQUE utilizes and has regular access to Target Location #1, (b) BOURQUE transacts illicit narcotics distribution to and from Target Location #1, and (c) Target Location #1 is a repository for some portion of the illicit proceeds.

**Target Location #2**

160.   325 Speen Street, Apartment 210, Natick, MA is Michael BOURQUE's residence. Target Location #2 is located at the Cloverleaf Apartments, a luxury apartment complex

located at 325 Speen Street in Natick, Massachusetts. The building is a ten-story

steel-framed exposed brick and mortar L-shaped structure. Parcel data obtained from the

Natick Assessor's Office indicates there are a total of 183 units contained in the building.

The building is situated on the northeast side of the Cloverleaf Mall which includes

Gold's Gym, Ethan Allen, and Burlington Coat Factory. There is a multi-level concrete

parking structure on the west side of the apartment complex and an in-ground swimming

pool on the east side. There is also a small parking area located between Gold's Gym and

the apartment complex. The main entrance to the building is located on the ground level.

The target apartment is #210, which is located on the second floor. The second floor is

accessed either by a centrally located elevator, or stairwells located at east and west ends

of the building. Exiting to the right from the elevator, the apartment is to the left side of

the corridor. The Target Location is identified by a white sign on the wall to the left of

the entry door. The sign is marked "210" with the Cloverleaf logo. The entry door is

yellow and opens in to the right.

161.   On January 22, 2013, I set up surveillance at 325 Speen Street, Natick, MA. On the

January 22, 2013, data from Court-authorized GPS tracking device affixed to the Bourque

2012 BMW indicated that the vehicle had just left a Woburn location believed to be a

meeting place for BOURQUE and at least one of his source of Oxycodone supply.

BOURQUE was observed arriving in the BMW. As BOURQUE exited the BMW, I

observed him look around while carrying two Dunkin' Donuts coffee cups, one in each

hand. The cup in his left hand contained a clear plastic top with straw; the coffee cup in

his right hand appeared empty as BOURQUE was carrying it tilted with the lid pressed

against his thigh. BOURQUE walked directly past a trash barrel, but did not dispose of either cup before entering the building. Based on my training and experience, as well as my participation in this investigation, I believe that BOURQUE's travel and observed conduct on January 22, 2013 are consistent with narcotics trafficking.

162. On March 29, 2013, as detailed above, BOURQUE purchased approximately 700 Oxycodone pills from OUELLETTE. After the transaction, data from the Court-authorized GPS tracking device affixed to BOURQUE's 2012 BMW revealed that BOURQUE had returned to Target Location #2.

**Target Location #3**

163. 30 Prairie Avenue, Newton, MA is the residence of Brian CHISHOLM. Target Location #3 is a single family brick front structure. It is rust colored brick with white trim and red shudders. There are three windows in the front of the house with two windows to the right of the front door and one window to the left of the front door. The front door has a white screened door with the number #30 visible along the frame. There is a small white awning above the door. The sides of the house are white vinyl siding. There is a small brick wall along the front of the house. There is a small drive way on the right side of the house that leads into the back yard. Along the driveway is metal fence. Along the left side of the house is a wooden fence separating the next door property.

164. On January 30, 2013, at 1:27 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#1) to Phillip GOOLST at P. Goolst Telephone #1. During the call with Phillip GOOLST, BOURQUE was overheard speaking to a third party and stated, "All right, Phil's going to come and get you. Barry's brother. What's your address over

there? 30 Prarie Avenue, he'll be there in five minutes." GOOLST asked, "And who am
I picking up?" BOURQUE stated, "Brian. You're picking up Brian CHISHOLM."

165.   On February 27, 2013, at 6:44 p.m., agents intercepted an outgoing phone call from
BOURQUE (on TT#2) to Barry GOOLST at B. Goolst Telephone #1. BOURQUE asked,
"Can you go over to Brian's right now? He's gonna give you, ummmm, he's gonna give
you like 800 bucks for me. And just leave it on the desk in an envelope. Barry GOOLST
asked, "Under the desk or under the keyboard (at DEX-Corp)?" BOURQUE stated,
"Yeah. Prarie Avenue. You know where it is? GOOLST stated, "Yup."

166.   On March 6, 2013, at 2:40 p.m., agents intercepted an outgoing phone call from
BOURQUE (on TT#3) to Barry GOOLST at B. Goolst Telephone #1. BOURQUE
stated, "Barry, don't fuck around when you drop the package (narcotics). He, you, gotta
be to, ah, back to Brian's house by like 4:15. At 3:36 p.m., BOURQUE (on TT#3) called
CHISHOLM at Chisholm Telephone #1. BOURQUE stated, "Barry is on his
way...[h]e'll probably be at your house by the time you get there." At 4:05 p.m.,
BOURQUE called CHISHOLM. BOURQUE stated, "He's at your house. Are you
there?" CHISHOLM stated, "Yeah, just ah, he just rang the door bell."

167.   On March 27, 2013, at 4:28 p.m., agents intercepted an incoming phone call to
BOURQUE (on TT#3) from a male believed to be CHISHOLM at Chisholm Telephone
#1. CHISHOLM stated that a third party is on the way to CHISHOLM's house to drop
off money that is owed to BOURQUE. CHISHOLM then asked BOURQUE if
BOURQUE can give the third party more (Oxycodone) tomorrow. BOURQUE
complained that the current price of Oxycodone from BOURQUE's supplier was $24 per

pill.

## Target Locations #4 and #5

168.    95 Robbins Street, Waltham, MA is the residence of BOURQUE's mother Jean Bourque

(Apartment 2 - Target Location #5), and BOURQUE's sister Kathleen Bourque

(Apartment 1 - Target Location #4).  Kathleen Bourque resides in Apartment 1 with her

boyfriend, Spencer Sostillo.

169.    Target Locations #4 and #5 are in a multi-family two story wooden structure.  It has gray

siding and white trim.  There are no shudders on the front of the structure.  There are two

front doors facing Robbins St.  The front doors are a darker shade of gray then the house

and the doors have a windowed section on the top.  The doors are elevated on a stair case

with railings and a flat roofed awning.  There is a number #95 visible in the middle of the

two doors.  There are two black mailboxes – one on each side of the doors.  Facing the

front of the house from Robbins Street, the mail box to the right of the right door (nearest

to the driveway) is labeled "Bourque".  To the right of the house is a small driveway with

a white canvas garage tent.  The rear of the house opens up into a commercial parking lot

belonging to the adjacent business.  There is a second floor door that is accessible from a

long wooden stair case.

170.    During this investigation, investigators believe that BOURQUE pays his mother Jean

Bourque to use her and her residence (Apartment 2) as a drop off and pick up point for

drug proceeds.  On February 19, 2013, at 2:06 p.m., agents intercepted an outgoing phone

call  from BOURQUE (on TT#3) to a male believed to be Spencer Sostillo at (617) 962-

3524.  During the call, BOURQUE stated, "You're going to come with me...um...just call

me when you get to the house. You're going to come meet me. I got to [U/I]...I'm going to give you an envelop to leave at my mother's for Brian (CHISHOLM). He's going to pick it up after work. And he's going to leave some money. All right? But I'm going to have you grab the mail. I'm going to call that kid. You have the 300 for that other thing?" Sostillo answered, "Yup." At 2:33 p.m., agents intercepted an outgoing phone call from BOURQUE (on TT#2) to a woman believed to be his mother Jean Bourque at (781) 891-5397. During the conversation, BOURQUE asked, "Did Spence get the checks?" Jean BOURQUE replied, "Yeah, he's going to bring the three of them up there." Later, BOURQUE stated, "Oh, Brian. I left that envelope for Brian (CHISHOLM). His mother stated, "Yeah." BOURQUE continued, "Okay, now you already got an extra 100 last week. You're aware of that, right." His mother stated, "Yes, I understand that." BOURQUE stated, "Okay, now he's gonna drop off, ummmmm, I think he might drop off like 1750, 1700 bucks and he's gonna take that envelope, so I'll let you know when he's on his way." His mother asked, "All right. So he's taking this envelope?" BOURQUE stated, "Yeah, and he's gonna leave you some money. I'll let you know how much it is." His mother responded, "All right, my dear." BOURQUE stated, "Thanks, mum." His mother answered, "All right. Bye."

171.    The investigation has revealed that BOURQUE uses "95 Robbins Street, Waltham, MA" (with neither Apartment 1 nor 2 specified) as a primary address for DEX Corporation according to Massachusetts Secretary of State corporate records, and as an address for his personal and business financial accounts, including:

a.      DEX Corp business checking account with Middlesex Savings Bank;

    b.      Title to BOURQUE's 2012 BMW;

    c.      BOURQUE's personal CapitalOne credit card;

    d.      DEX Corp American Express business credit card account;

    e.      BOURQUE's personal GE CareCredit Card;

    f.      BOURQUE's personal Citi credit card; and

    g.      BOURQUE's personal Juniper CapitalOne credit card.

172.   BOURQUE's sister, Kathleen Bourque, at Apartment 1, is believed by investigators to control most of the mail and paper correspondence related to BOURQUE and DEX Corporation. As detailed above, DEX Corporation is BOURQUE's shipping business used as a "front" for BOURQUE's distribution of narcotics. Agents have intercepted a number of phone call s between BOURQUE (on TT#2) and (781) 891-5397 (Kathleen Bourque and Jean Bourque).

    a.      On March 7, 2013, at 12:37 p.m., BOURQUE asked Kathleen if he has any checks today. Kathleen informed BOURQUE that there were no checks, but two items from the registry (Registry of Motor Vehicles).

    b.      On March 7, 2013, at 12:43 p.m., Kathleen informed BOURQUE that there are two unpaid parking tickets and other bills for BOURQUE. Kathleen stated that she would leave the items downstairs so Spencer can take them to DEX Corp later.

    c.      On March 8, 2013, BOURQUE stated to Kathleen that the checks should be there in the next half hour.

    d.      On March 11, 2013, Kathleen stated that BOURQUE had received checks from

vendors.

e.      On March 12, 2013, at 1:42 p.m., BOURQUE and Kathleen discussed a letter

from the Internal Revenue Service (IRS) about the taxes owed for DEX Corp.

f.      On March 14, 2013, at 12:54 p.m., BOURQUE asked Jean, referring to her as

"Mom," if any checks had come to the house.  Jean stated that there were no

checks at the house.

### Target Location #5

173.    6 Lancaster Rd., Shirley, MA is the residence of Mark OUELLETTE.  Target Location #5

is a a two story, red brick and stone dwelling with a large white flag pole affixed to the

front of the residence on the second floor. The main entry way as you face the dwelling

from Shirley road is a large brick archway. Inside the arch way you can gain access to the

front door of the dwelling. The building is a refurbished town library that was converted

into a private residence. The property is currently under construction and the numeral '6'

does not appear on the property at this time.

174.    As detailed above, BOURQUE, with COTTER and MCGUIRE, purchased

approximately 700 Oxycodone pills from OUELLETTE.  After the transaction took place

at a Dunkin's Donuts in Shirley, MA, law enforcement surveilled OUELLETTE and

followed him back to his residence (Target Location #5).  When OUELLETTE exited

Target Location #5 a short time later, agents spoke with OUELLETTE, and he consented

to a search of his home, which revealed approximately 1,500 to 2,000 pills of suspected

Oxycodone, over $30,000 United States Currency (USC), and one firearm.

175.    Upon receiving information that Oxycodone sales continued from OUELLETTE's

72

residence at Target Location #5, law enforcement conduct two controlled purchases of Oxycodone from OUELLETTE at his residence.

a.  On April 26, 2013, a cooperating source (CS) was provided by law enforcement with $300 to purchase ten Oxycodone pills at Target Location #5. After the transaction, CS told law enforcement that CS had entered OUELLETTE's residence at 6 Lancaster Road, Shirley, MA, where OUELLETTE produced a prescription-style bottle from his front pocket, poured ten pills from the bottle into OUELLETTE's hand, and delivered the pills to CS. CS gave the $300 directly to OUELLETTE.

b.  On May 2, 2013, the same cooperating source (CS) was provided by law enforcement with #400 to purchase another ten Oxycodone pills at Target Location #5. After the transaction, CS told law enforcement that CS was invited into 6 Lancaster Road, Shirley, MA, by OUELLETTE. Inside Target Location #5, OUELLETTE went from the kitchen to the back of the home in the bedroom area where OUELLETTE then returned with ten Oxycodone pills. OUELLETTE handed the pills to CS. In exchange for the pills, CS handed OUELLETTE $300. Prior to the transaction, CS had spoken with OUELLETTE, who stated that he was on his way to Lawrence, MA to pick up Oxycodone.

## VI. CONCLUSION

176.  WHEREFORE, I submit that there is probable cause to believe that (1) Michael BOURQUE, (2) Robert HAGENAARS, (3) Brian CHISHOLM, (4) Barry GOOLST, (5) Phillip GOOLST, (6) Thomas EHWA, (7) Frank MCGUIRE, (8) Michael ROY, (9)

Christopher YANCEY, (10) Corey ASSENCOA, (11) Sean COTTER, (12) Mark

NEWTON, (13) Mark OUELLETTE, (14) John KINNEY, and (15) Raymond

PANAGGIO:

a.      have conspired to distribute Oxycodone, in violation of 21 U.S.C. § 846; and

b.      evidence of said criminal offense, such as drug proceeds, drug ledgers, and other

        records (including electronically-stored records) included in Attachment B of this

        affidavit, will be found inside the Target Locations.


I declare that the foregoing is true and correct.


                                        _____
                                        MATTHEW J. OUTWILL
                                        Task Force Officer
                                        Drug Enforcement Administration


Subscribed and sworn to before me this ____8th____ day of
May, 2013.

_____
HON. MARIANNE B. BOWLER
United States Magistrate Judge
District of Massachusetts


74